UNION SPECIAL MACH. CO. v. SINGER MFG. CO.

(Circuit Court of Appeals, Third Circuit. September 2, 1915.)

No. 1861.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—SEWING MACHINE.

　The Woodward patent No. 890,582, for a sewing machine adapted for sewing the heel seams of shoes, which makes both a straight-away and a zigzag or overedge seam, with means for shifting from one to the other at the will of the operator while the machine is in motion, but having a stop mechanism carried by a moving part of the machine, which prevents the complete movement of the shifting mechanism until the needle has reached a predetermined position above the leather, where it will not be injured by the change in direction of the movement, discloses invention of merit, and with the exception of one claim is not limited to mechanism which stops the shifting movement when the needle is at a particular designated point; also held infringed by the machine of the Gray patent, No. 933,032.

Appeal from the District Court of the United States for the District of New Jersey; Edward G. Bradford, Judge.

Suit in equity by the Union Special Machine Company against the Singer Manufacturing Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 215 Fed. 598.

Joseph C. Fraley, of Philadelphia, Pa. (C. L. Sturtevant and E. G. Mason, both of Washington, D. C., on the brief), for appellant.

Gifford & Bull, of New York City, for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

BUFFINGTON, Circuit Judge. In the court below the Union Special Machine Company, owner of patent 890,582, granted June 9, 1908, to R. G. Woodward, for a sewing machine, filed a bill against the Singer Manufacturing Company, charging it with infringement. On final hearing that court, in an opinion reported at 215 Fed. 598, held such infringement had not been shown. From a decree dismissing the bill plaintiff took this appeal. The art in question involves high-speed power sewing machines. It is exceedingly complicated, and this fact, together with the further one that we are constrained to differ from the conclusion reached in the very full opinion of the learned judge who decided the case below, must be the warrant for the length of this opinion.

The sewing machines made by both parties are used in the shoe making, both for fancy stitch or ornamental sewing, and also for fastening the seams of a shoe together. As an example of the extent to which the sewing machine was used for ornamental shoe sewing and leather stitching, the machine of Hart & Hills may be cited as representing the best known in the art. This arises from the fact that it was patented as far back as 1888, was marketed by such great companies as the Wheeler & Wilson, and subsequently by the Singer Company, which absorbed that company. This Hart & Hills machine not only represents the highest mechanical efficiency in the art of ornamental stitching, but it also is the nearest alleged approach the art had developed to the machine here in controversy. Its working and capacity in the field of ornamental stitching may be best pointed out from the specification, aided by the accompanying drawing, which constitutes Figure 6 of Hart & Hills patent No. 406,277.

It will be noted that this machine first sews a straight line of stitches, and then turns into sewing a number of such stitches in zigzag form. In that regard the patent says:

"The object of our invention is to provide novel means for operating the vibrating frame, stopping and starting its vibrations at will, and making a straight line of stitches, or a zigzagged line of stitches, or alternating straight and zigzagged lines of stitches, as may be desired."

It will be noted each leg of the triangle is made up of a number of stitches, and as the number of such stitches in each leg of the V had to be uniform the machine was so constructed that the mechanism to change the direction of the stitch only became effective when the required number of stitches had been made in such leg. Moreover, the machine was also used at moderate speed; the patent stating:

"By this arrangement it will be seen that a comparatively slow intermittent reciprocating motion is imparted to the needle crosswise to the line of feed while the needle is above the work, so as to produce the zigzag line of stitches shown at *X* in Figure 6."

This machine, with its capacity for straight and zigzag ornamental pattern work, was widely known and used in the art; but no one, during the 17 years following the grant of the patent, seemed to have either used it, or indeed to have conceived of its use, in the seam-sewing

branch of the art. In that branch of shoe manufacture it had long been customary to unite the two parts of the shoe upper at the back, and thus form the heel by superimposing the two pieces of leather, with their edges flush, and sew them together with an ordinary straight-away seam a short distance back from the edge. When the united pieces were spread out as shown in the accompanying sketch a ridge was formed which, while not objectionable near the top, was highly objectionable when pressing against a wearer's heel. The practice, therefore, was to subject the ridge to heavy pressure, which involved rehandling and expense, and did not wholly do away with the ridge. About 1898 an employé of a shoe factory at the North Star Shoe Company in Minneapolis began the practice of

*Straight-away Heel Closing*
*Seam as formed*     *Fabric opened out*

making a seam by the successive use of two machines well known in the art. He first sewed the upper part of the heel seam on a regular straight-away machine, and then transferred the upper to a regular overedge machine, which made a hinge-shaped joint. The result is shown in the accompanying sketch, in which, when the two pieces are spread out, it will be seen the curved overedged part opens out on a hinge

*North Star Method*

*Straight-away seam*

*loose end of zig zag thread*

*overlap of seams.*

*loose end of Straight away thread.*

*overedge seam*

and leaves no seam, as shown, for instance, in the accompanying sketch, on a flat surface.

*Over edge Stitching along superimposed edges.*
*Fabric as seam is formed.*     *Fabric opened out flat View of Outer Face.*     *Fabric opened out flat View of Inner Face.*

In this North Star practice the ridge was thus confined to the upper part, where it was unobjectionable. This practice, a decided advance over the old art, though open to several objections, was followed for several years. Thus it required, as against the practice of the old

art, two machines instead of one; it required three distinct manipulations as against the one straight-away seam of the old art, viz. sewing the straight-away part seam on one machine, transfer to the second machine, and sewing the overedge part seam on the latter machine. Instead of the work being done continuously by one operator on one machine, it was done noncontinuously by one operator on two machines, or by two operators if done in unbroken sequence. The two stitchings also had to overlap each other to prevent raveling, and this made a bunch and left loose thread. It is obvious, of course, that in this practice much of the potential output of high-speed machines was also lost. The practice, unsatisfactory as it was, challenged attention, and Woodward, the present patentee, in 1902 conceived the idea of a continuous straight-away overedge seam, a seam which was so novel in the art as led the Patent Office to grant him a patent for the seam for sewed articles in patent No. 786,934, of April 11, 1905, as a new article of manufacture, shown in the accompanying drawing:

At this point the inquiry naturally arises: How could the Patent Office, having already before it the stitch shown in Hart & Hills' Figure 6 above shown, and a machine capable of doing both straight-away and zigzagged stitching, grant a patent to Woodward for the form of seam he claimed to have originated? But the answer is quite obvious. The form of stitch which Hart & Hills' machine made was not the overedge, hinged stitch which eliminated the objectionable ridge. Woodward's seam had but two stitches in each leg of the zigzag of his seam, one near the edge and one clear over the edge, which made a hinged ridgeless joint, while the Hart & Hills machine had a plurality of stitches in each leg of the zigzag, which, if used to join two superimposed edges, would have left the stiff upright ridge shown in one of the foregoing drawings.

It is therefore manifest that, in the estimate of the Patent Office, the difference between the two seams was such that it involved patentable novelty to change from the one to the other. And if it was right in so holding, it would equally seem clear that it would also require inventive novelty to so remake the Hart & Hills straight-away machine as to enable it to make this novel straight-away, overedge, continuous seam. And such the outcome proved to be, for whereas Woodward, the experienced designer of the plaintiff, and Gray, the experienced designer of the defendant, in the succeeding years sought

to devise a high-speed machine that should make such a seam, neither of them used the Hart & Hills machine as their base. And why they did not is quite apparent, when the problem confronting them is fully comprehended. The operative insistence of the art required that such continuous seam should be made on a high-speed machine making 3,000 stitches a minute, not on a machine such as Hart & Hills, which operated at very much less speed. When it is realized that such high-speed machine makes 50 stitches a second, and that the change from straight-away to a sidewise stitch must be made when the needle is above the leather, and must not be made when it is in the leather, we see the grave inventive difficulties confronting its solution. This problem Woodward attempted to solve by the device shown in his patent No. 753,187, granted February 23, 1904. The proof is that this device was made by the complainant, but after trial proved inefficient and was withdrawn from the market. In that regard the proof is:

"After we ran it in the factory of the Goodbar Shoe Company for a period of six or seven months, we by order of the company took it out of the factory and returned it to Chicago. There was no trouble with the quality of the work which was turned out. The trouble was with the mechanism employed to make the change from straight-away to zigzag stitches, or vice versa. We found that the strain upon the machine in changing from straight-away to zigzag, or vice versa, while running at high speed, was such as to cause a jar to the mechanism employed to make the change of stitches, and also to the machine itself. The machine, by reason of these objections that I have named, was withdrawn from the market."

The cause of this vibration is testified to by another witness, who says, after describing the numerous parts affected by the stitch changing mechanism:

"All this mass of moving parts must be set instantaneously in motion. The result necessarily is to give a very severe shock to the mechanism, which gets it quickly out of order, makes an objectionable noise, and objectionably vibrates the entire machine and the workbench on which it stands."

Nor did Woodward alone fail to solve the general problem of constructing a satisfactory heel-closing machine. The great Wheeler & Wilson Company had made two machines, viz. 17—9—1, No. 16,276, and closing machine 13,485, and the great Singer Company had made two, viz. Nos. 1,142,715 and 67,600; but in each of these machines there was lacking what we shall hereafter see was the basic feature of Woodward's solution of the problem, namely, preventing the stitch-changing mechanism from acting when the needle was in the leather. In that regard the proof as to these four machines is that:

"In each of these machines, the shift can be made at any time, there being nothing to prevent making the shift when the needle is in the wrong place."

This vital feature of these devices Woodward sought to supply, as we have seen, by the device of his patent No. 753,187; but, as it seems to us from the testimony, he failed in his effort to secure satisfactory stitch-changing by reason of the fact that the actual stitch-shift or stitch-change was not effected directly by the operator, but only indirectly by the operator putting in action a long train of connected mechanical agencies which themselves made the shift. But,

whatever the specific cause, the proof is clear that Woodward's device made under his patent wholly failed to satisfactorily solve the problem. Thereupon, on December 3, 1902, he applied for the patent here in issue, No. 890,582, which was finally granted June 9, 1908.

As we view this patent, three salient features stand out which are new in heel-closing machines: First, the abstract conception that stitch-change from straight-away to overedge must be limited to a time when the needle is not in the leather; the second, the abstract conception that the operator, and not the mechanism of the machine, should actually throw the shifting device itself into action; and, lastly, the concrete disclosure of means whereby the operator himself could throw the shifting device into action only when the needle was above the fabric. As we view it, the vital and effective mechanical feature in practically effecting these conceptions was in a stop carried by a moving part of the machine. As to the operator himself, and not the working of the machine, putting the shifting devices into action, the patent says:

"My invention relates to certain improvements in sewing machines, and has for its principal object to construct a machine capable of forming both straight-away and zigzag or overedge stitches, in which the character of the stitch may be changed *at the will of the operator*."

After reciting that his prior patent, No. 753,187, was for a machine of a similar type, and that "the present invention consists in certain features of construction and arrangement of operating parts, whereby the change from zigzag to straight-away stitching, and vice versa, can only be accomplished while the needle is descending and about to enter the goods, this being accomplished on the left-hand stitch when the zigzag mechanism is at work," the specification adds:

"*  *  * Or perhaps in one sense the invention may be stated to consist in combining with an over-seaming machine, adapted to have a zigzag movement imparted to the needle, mechanism for imparting such movement, with means for throwing the same into and out of operation at the will of the operator, said means including locking devices which alternately act at the will of the operator, to hold in engagement or release from engagement the zigzag needle mechanism from its operative engagement with the driving shaft."

In other words, the machine was adapted to sew zigzag, it had mechanism for imparting lateral needle movement, which could be thrown in or out of direct operative connection with the driving shaft by the operator at will, subject to the restrictions of the locking device. We are therefore justified in regarding Woodward's device generally as a duplex, straight-away zigzag stitch machine in which the operator, and not the mechanism of the machine, threw the stitch shift into action, but in which a moving part of the machine prevented the operator from so doing at such times as the shift was dangerous. The placing of the shift-controlling mechanism on a moving part of the machine was, as we see it, the key to this combination. Such stop being on a moving, operative part of the machine, it will be apparent that the shifting position and changing control of the stop was dominated by the operation of the machine. The result was that while the operator could at any time, by a simple direct mechanism, throw

the shifting device into potential operative relation, yet the stop stayed the effect of that throw until the further movement of the machine could safely permit the needle to shift laterally. When the machine reached that point, then the stop on the moving part of the machine had been brought to a position which safely permitted the will of the operator to be operatively carried out. It will thus be seen that the stop carried on, and therefore dominated by, the machine, was the safety insurer of the needle shift. It permitted free will to the operator in throwing the shifting device into a position of operative relation with the needle, but it postponed the shifting of the needle until the further movement of the machine made such shift safe.

As we analyze this very complicated machine which Woodward undoubtedly has wonderfully perfected, it seems to us that the placing of the stop on a moving part of the machine is the pith and marrow of the structure. The operator could throw the shift, but the moving stop stayed it and kept it functionless until the movement of the machine placed the needle at a place where it could be safely shifted, and when this needle-safety point was reached the same forward movement of the machine that had carried the restraining stop to a dominating position carried it on to a point where it did not dominate. In other words, placing the stop on a moving part of the machine enabled the movement of the machine to so dominate the stop as to prevent or allow lateral needle shift. This will be apparent from a study of the file wrapper. When Woodward's application was pending, several of his claims were at first rejected; the office holding that Woodward made no—

"exercise of the inventive faculty in making use of a stop carried by a moving part of the machine for preventing action of the controlling means acting on the needle-vibrating means except at a predetermined time, which is shown in the patent to Hart in connection with the ordinary needle-vibrating mechanism disclosed in the patents to Diehl and Noble of record; that is to say, the stop used in the construction of Hart performs the same function in connection with the means for vibrating the needle therein shown as does the stop of applicant which is used in connecting with a needle-vibrating mechanism similar to that shown in the patents to Diehl and Noble of record."

This statement Woodward controverted, and averred:

"That the patent to Hart fails to show a stop carried by a moving part of the machine mechanism for preventing complete movement of the controlling means. Hart shows a stop which is spring-pressed in one direction and which is moved in the opposite direction by a cam. Applicant has done away with all these intermediate parts, and controls his mechanism directly from the moving part of the machine. Furthermore, when the controlling means is controlled by a moving part of the machine, the operation thereof is positive, and actually prevents operation of the controlling means except at certain times. In the Hart construction the controlling means could be operated at any time by manually releasing the stop without bringing the parts of the machine to the proper position for shifting of the mechanism."

The correctness of Woodward's contention was conceded, and we find in the three claims here in issue this feature described as follows: In claim 27 we have the generic element of "a stop carried by a moving part of the machine mechanism," limited only by the requirement, "for preventing complete movement of said controlling means, except

at predetermined points," while in claims 44 and 46 the stop is embodied in somewhat more specific form, all three of such claims being as follows:

"27. In a sewing machine adapted for straight-away or zigzag stitching, a driving shaft, the combination of the needle bar and means for reciprocating it vertically, means for vibrating it laterally, including a vibrating member, connections between the vibrating member and the driving shaft, means for throwing said connections into and out of operation, and controlled by the operator, and a stop carried by a moving part of the machine mechanism for preventing complete movement of said controlling means, except at predetermined points, substantially as described."

"44. In a machine for straight-away and zigzag stitching, a needle and complemental stitch-forming mechanism, means for vibrating said needle to form zigzag stitches, a treadle, means intermediate said treadle and said vibrating mechanism, including a lever, whereby the latter may be rendered effective or ineffective to vibrate the needle, and means co-operating with said lever for preventing the operation of said treadle, except when said needle is in a predetermined position."

"46. In a machine for straight-away and overedge stitching, a needle and complemental stitch-forming mechanism, mechanism for vibrating said needle to form the overedge stitching, controlling means for rendering said vibrating mechanism effective or ineffective, including a lever, a treadle connected thereto for operating the same to cause the overedge stitching to be effected, a spring for operating said lever to cause the straight-away stitching to be effected, and means for preventing the operation of said lever while the needle point is below the plane of the upper surface of the material during the formation of certain stitches."

Referring at this point to the device of Woodward, as shown in the accompanying colored drawings, we may say that the first is a side elevation of the general type of sewing machine embodying Woodward's invention; the second is a cross-section showing the lever in normal position and the machine adapted for straight-away sewing; the third shows the lever depressed and the machine adapted for zigzag sewing; and the fourth shows the device for locking the overedge stitch mechanism. $E$, on the first drawing, is the leather plate under which are the ordinary looper and feeder mechanisms operated from the main shaft $B$. On $B$ is a pinion $F$, whose teeth mesh with those on the gear wheel $F'$, which turns freely on a stud shaft $f$ (shown on drawings 2 and 3), secured in the arm $a$. The outer end of the shaft is provided with an enlarged circular head $f'$, forming a guide and support for a (green) eccentric or cam secured to and rotating with the gear wheel $F'$. This cam rotates between and in working contact with the two (green) arms $g$ and $g'$ of a (green) frame $G$, hung on a pivot $g^2$, carried by the arm $a$, the movement of the eccentric oscillating said arms. To the (green) frame $G$ is secured by screw $i$ a (green) segment $I$ having a curved slot $1$ therein, the center of which is at times slightly eccentric to the center of pivot pin $j$ (shown in red on Figure 3), carried by the lower end of (red) arm $J$, depending from and rigidly secured to (red) rock shaft $J'$, from which movement is imparted to the (red) swinging needle bar frame $2$ of Figure 1. $K$ is a (yellow) bar or link having at one end a head embracing a stud $3$, which is adjustable up and down in the curved slot $1$ to vary the amount of throw of the (red) rock shaft $J'$. Bar $K$ has a longitudinal

*Fig. 1.*

| RED | GREEN | YELLOW | LAVENDER | BLUE |
|---|---|---|---|---|
| *2-JJ¹j* | *I-iGgg¹g²* | *3-5-7-K* | *12,13,15,16,20,21,22-25-d¹* | *8,9,10,11* |

*Fig. 2.*

| RED | GREEN | CHECKED GREEN | YELLOW | | LAVENDER |
|-----|-------|---------------|--------|---|----------|
| $2\text{-}J^1Jj$ | $I\text{-}iGgg^1g^2$ | $ff^1f^2$ | $3\text{-}5\text{-}7\text{-}K$ | | $12\text{-}13\text{-}15\text{-}16\text{-}20\text{-}21\text{-}22\text{-}25\text{-}d^1$ |

| BLUE | BROWN |
|------|-------|
| $8\text{-}9\text{-}10\text{-}11$ | $23$ |

Fig. 3.

| RED | GREEN | CHECKED GREEN | YELLOW | LAVENDER |
|---|---|---|---|---|
| 2-$JJ^1j$ | $I$-$iGgg^1g^2$ | $ff^1f^2$ | 3-5-7-$K$ | 12-13-15-16-20-21-22-25-$d^1$ |

| BLUE | BROWN |
|---|---|
| 8-9-10-11 | 23 |

*Fig. 4.*

| RED | YELLOW | LAVENDER | BLUE |
|---|---|---|---|
| 2-JJ¹j | 3-5-7 K | 12-13-15-16-20-21-22-25-d¹ | 8-9-10-11 |

slot *5*, through which passes the (red) pivot pin *j*, the outer end of *K* having pivoted thereto, on pin *7*, a pivoted (blue) frame *8*, which has at its forward end (blue) slotted side forks *9* embracing the (red) pivot pin *j* on the (red) arm *J*. When these (blue) forks embrace the (red) pivot pin *j*, the swinging of (green) segment *I* causes (red) rock shaft *J'* to oscillate. Projecting downwardly from this (blue) pivoted frame *8* is a lug *10*, having on its lower end a pin *11* adapted to fit in a curved slot *b'* on a (lavender) plate *12*, screwed to (lavender) plate *13*, which is pivoted upon a stud *15*, secured to bracket *16'* of the machine frame. The slot *b'* is formed substantially about the (red) pin *j* as a center, and is slightly wider than the diameter of the pin *11*, in order to permit freedom of movement of said pin *11* in slot *b'*, when the stud *3* is adjusted to different points in the length of the curved slot *1*. The plates *13* and *12* are recessed as at *c'* (Figure 4), so that when thrown in their upward position they engage the (red) pivot pin *j* on the (red) rock shaft arm *J'* and thus hold the (red) rock shaft from oscillation when the (blue) pivoted frame *8* is out of engagement therewith. Frame *8* is normally pressed downwardly by spring *17*, seated in the yoke *16*, forming a part of frame *8* and said spring at its upper end bears on the under side of (yellow) bar *K*.

We come now to the stop mounted on a moving part of the machine, in which, as we have said, centers the gist of Woodward's device. It will be seen (Figure 2) that (lavender) plate *13* is pivoted at *19* to the (lavender) link *20* pivoted at its lower end on the (lavender) vertically sliding block *21*, having on its inner side the (lavender) projection *22*,

which co-operates with a (brown) projection *23* on the (green) frame *G*, and *prevents movement of the (lavender) part 22, except when the (green) cam or eccentric* f² *is in a certain position,* this being so timed that the cam will only assume this position as the needle is about to enter the leather in its descent. Without entering into minor details we may say that lever *25* is actuated by a treadle which is normally spring-pressed upward. This leaves (lavender) plates *12* and *13* in engagement with (red) pivot pin *j*, so that the machine will then sew straight-away. When, however, lever *25* is depressed by the treadle, then the parts are shifted to cause the (blue) pivoted frame *8* to engage the (red) pivote pin *j*, whereby oscillatory movement will be imparted to the rock shaft, and by it zigzag movement to the needle. It will, of course, be seen that, while the operative may tramp the treadle at any time, this will not force the (blue) pivoted frame *8* entirely into engagement with the (red) pin *j*, until the (green) cam *f*² has pulled the (brown) projection *23* out of line with (lavender) projection *22*, and this happens, and can only happen, when the needle is about to enter the goods. While it is true that in describing this intricate mechanism the specification says, "The change from zigzag can only be accomplished while the needle is descending, and about to enter the goods," it is clear to us either that this statement was inadvertently made, or else that it was meant to designate the shift-changing safety zone between the needle emerging from the leather on its ascent and re-entering it on its descent. We think this is made perfectly plain from the specification as a whole; for, in describing in the extract quoted below the permissive capacity of the stop, it is said the "stop prevents the throwing out *except* when the needle point is *above* the plane of the upper surface of the fabric." In other words, the change-permissible period is not when the needle is going up or coming down, but, whether going up or coming down, it is above the fabric. This the specification makes clear:

> "It will be understood that the (blue) pivoted frame *8* cannot be forced entirely into engagement with the (red) pin *j*, until (green) cam *f*² has pulled the (brown) projection *23*, out of line with (lavender) projection *22*, which happens when the needle is on its descent and about to enter the goods. It is necessary that the needle should be positioned in line with the straight-away stitch when the vibrations thereof are rendered ineffective, so that in the continued reciprocation of the needle the stitches will be properly placed within the fabric. If, therefore, the needle is making the overedge stitch, that is, reciprocating beyond the edge of the fabric, and the vibrating mechanism would be thrown out, *the needle would have to be moved laterally, and if below the fabric would be sprung or broken. By my improvement, wherein a stop prevents the throwing out except when the needle point is above the plane of the upper surface of the fabric, or in line for the straight-away stitching, the above objection is avoided.*"

It will also be noted that, while the element of a stop described in some comprehensive form is found in every one of Woodward's 59 claims, in not one of them, except the ninth, where the stop is described as "means for preventing change from idle to active movement of said vibrating mechanism except at a predetermined point *in the descent of the needle,*" is there any description or limitation of

the stop being restricted to the period when the needle is descending. In all fairness it would seem as though the unrestricted language in that regard of these 58 other claims might well, in view of the statement quoted above from the specification, "By my improvement, wherein a stop prevents the throwing out *except when the needle point is above the plane* of the upper surface of the fabric, or in line for the straight-away stitching," be regarded as the Patent Office's view that it did not regard Woodward's device as limited to a stop-restricting needle shift only in the downward thrust of the needle. And when it is considered that the time of that half of the needle's movement, both up and down, which is above the fabric is about one six-thousandth of a minute, and of the upward thrust above the fabric about a twelve-thousandth, we can readily see the grave physical difficulty of basing the question of infringement on such uncertain infinitesimal instants of time, rather than on the indisputable practical result that when the needle point is above the fabric a shift can be and is safely made, and when the needle is in the fabric a shift cannot be and is not made.

This construction of the specification as a whole makes it clear that Woodward's real contribution to the art was not the defining of any particular part of the needle's super-fabric travel when the shift was made, but in the fact, proven by practice to be true, that the shift was made in the needle's super-fabric, and not in its sub-fabric, travel, or, as stated in the extract quoted above, the "stop prevents the throwing out except when the needle point is above the plane of the upper surface of the fabric." It will also be noted that the Patent Office recog-nized the broad, comprehensive character of Woodward's disclosure of a sub-fabric stop, in that wherever the stop was made a claim element it was in general, inclusive terms, and not as a specified, defined, or restricted mechanism, except in the one claim we have noted. Thus in claim 27, here involved, we have "a stop" whose only requirement is that it be "carried by a moving part of the machine mechanism for preventing complete movement of said controlling means, except at predetermined points." In claim 44, here involved, we have the stop described as "means co-operating with said lever for preventing the operation of said treadle, except when said needle is in a predetermined position." And in claim 46, here in issue, we have the stop described as "means for preventing the operation of said lever while the needle point is below the plane of the upper surface of the material during the formation of certain stitches." To sum up, therefore, we may say that it was the fact and function of a predetermined, sub-fabric, needle-shift stop that constituted the value of Woodward's inventive dis-closure to the art, and not the mere mechanical use of a cam to show how his disclosure could be practically used. It follows, therefore, that for us now to narrow his patent protection to servile, mechanical copies of his cam, when the Patent Office has given his stop an in-clusive breadth in the claims it allowed, would tend to thwart the pur-pose of the Patent Office, and in effect penalize invention and stimulate patent piracy.

Regarding, then, Woodward's disclosure as one of really substan-tial merit in an important art, we next turn to the alleged infringing

device. That it secures the same novel result as Woodward's device is undisputable. Before that disclosure the defendant, in spite of its long years of experience, its able designers, its interest in satisfying the demands of a great industry, and its ample financial means, had never solved the problem of giving the art a successful straight-away overedge sewing machine. The machine it is operating is based on a patent applied for after it was sued as an infringer. Referring to such patent, No. 933,032, applied for June 11, 1909, and granted August 31, 1909, to Gray, it will be noted that by its own statements it does not purport to be "directed broadly to needle-jagging mechanism capable of being changed at the will of the operator for producing either straight-away or zigzag stitching while the machine is in motion." This disclaimed problem, it will be observed, was the one to which Woodward's device was addressed, for, as stated in his specification, it had "for its principal object to construct a machine capable of forming both straight-away and zigzag or overedge stitches, in which the character of the stitches may be changed at the will of the operator." As this problem had already been solved by Woodward; and as the defendant had, when Gray applied for his patent, been sued on Woodward's patent; and as Gray disclaimed the patenting of any such device, but expressly confined his disclosure to "certain specific devices for controlling the needle-jagging mechanism"; and as Woodward had made no claim for any specific device for controlling such mechanism—it is clear that the subject-matter of Woodward's and Gray's disclosures and claims were different; and while Gray's specific controlling device might constitute ground for a servient claim, it could in no way dominate or affect the breadth of Woodward's prior disclosure and claims. Indeed, that Gray's device is servient to Woodward's disclosure is shown by the fact that his device embodies the basic features which Woodward had already shown, to wit, a stop carried on a moving part of the machine and a super-fabric needle shift in a straight-away overedge machine. Thus we find among the elements of Gray's claim 1 "a cam member carried by a moving part of the machine"; in claim 2 "a cam member yieldingly mounted upon a moving part of the machine"; in claim 5 "a cam member mounted upon a moving part of the machine." And in his specification we find the super-fabric needle shift in the straight-away overedge type of machine and the efficacy and adaptiveness of this feature of his type of machine to safely effect such shift thus referred to:

"It will be observed that the construction of the controlling or locking cam *51*, and its action upon the operating lever *34*, is such that said lever is free to be manually operated through the treadle rod *44* whenever the needle is raised above the work. * * * "

It is equally evident that the position of the lever *34* may be changed "at any time while the point of the needle is above the work on either the 'depth stitch' or 'edge stitch' cycle without injuring the work or endangering the breakage of the needle." Seeing, then, that the application of Gray's "specific devices for controlling the needle-jogging mechanism" are shown by his patent to have been adapted to use in

a straight-away, overedge machine, let us turn to the defendant's machine and inquire whether, in using a machine of that type, with Gray's particular form of stop, the defendant infringed the claims in issue of Woodward's patent. Without entering upon a minute description, we confine ourselves to such features of defendant's machine only as throw light on the question of infringement.

The three accompanying drawings will illustrate the machine:

*Fig. 1.*

*Fig. 2.*

*Fig. 3.*

*Fig. 4.*

The sewing mechanism proper is of a general, well-known type, and is adapted either to straight-away lock stitches in the same vertical lines or zigzag stitching by lateral shifts and each successive needle thrust. The needle-carrying frame vibrates laterally, like a pendulum, on a horizontal pivot, instead of swinging, as does the plaintiff's frame, on a vertical pivot, like a gate. Both such sewing devices were common in the prior art. The defendant's vibrating mechanism is one which the proof shows "has been in extensive use in Singer sewing machines for about 30 years." The lateral vibration of defendant's needle is made by the swing of bar $F$, one end of which, by its forks $b$ $b$, engages rotating cam $E$ mounted on shaft $D$. In the normal position of the machine, which normally does straight-away sewing, the oscillation of bar $F$ by constantly rotating cam $E$ simply oscillates bar $F$ up and down on pivot $c$ without causing any vibration of the needle bar frame $C$. In that position the oscillation of bar $F$ is idle and functionless. It plays no part in straight-away sewing. To make it functional, and to do overedge sewing, the idle vertical reciprocating of the forked end of bar $F$ is changed to a reciprocating horizontal thrust by changing the relation of that forked end to the rotating cam $E$. This is done by the swinging link $M$, which is pivoted at one end to bar $F$ at $m$ and at the other end is pivoted to a crank arm $L$ (shown on drawing 3). This crank shaft $L$ is attached to shaft $H$, which is mounted on a stationary portion of the machine and may be rocked by lever $G$. Now, so long as crank arm $L$ remains in normal line with bar $F$, the latter turns idly at one end on the pivot $c$ and oscillates idly up and down at its forked end on cam $E$. But when crank arm $L$ is thrown out of line with bar $F$, which is done by lever $G$ turning, shaft $H$, attached to crank arm $L$, then the pivot $i$ of link $M$ is thrown out of line with bar $F$, the latter swings on pivot $i$ and thus a reciprocating horizontal thrust of the bar is set up which causes the needle frame $C$ to swing or vibrate on pivot $a$. In other words, the calling

into play of pivot $i$ as a controlling center calls into play the function of pivot $a$ as a center on which the new reciprocating thrust spends itself. Or, to state it in other terms, the link $M$ had been simply swinging idly with the bar $F$. But when the axis of link $M$ is thrown out of line with bar $F$ the swing path of the link becomes an arc which does not coincide with the arc of oscillation of bar $F$ on pivot $c$. These two forces vent themselves in a resultant compound of movement, which takes form in a vertical swing of the forked end of the bar from the pivot $c$ and a horizontal swing of the bar forward and back from the pivot $i$. This horizontal thrust of bar $F$ swings needle-bar frame $C$ on pivot $a$ and the vibrating needle makes zigzag stitches.

Turning, then, at this point, for example, to Woodward's claim 27, it is clear that the defendant's combination, in the words of that claim; used "a sewing machine adapted for straight-away or zigzag stitching"; the machine has "a driving shaft"; it has "a needle bar," and it has "means for reciprocating it vertically"; it has also "means for vibrating it laterally, including a vibrating member"; it has "connections between the vibrating member and the driving shaft"; it has "means for throwing said connections into and out of operation"; and, lastly, these means are "controlled by the operator." These elements, none of which are by their terms limited to any special construction, are all found in the defendant's device, and that conclusion is, we think, made clear by the foregoing description and analysis of its machine. It follows, therefore, that infringement is made out if the defendant's combination has the remaining element of Woodward's claim, to wit, "a stop carried by a moving part of the machine mechanism for preventing complete movement of said controlling means, except at predetermined points." On this question, in our judgment, the case turns. Let us, therefore, see what stop mechanism is used in defendant's device. The stop proper is the revoluble disc $O$ shown on drawings 2 and 3, which is spring-yieldingly attached on the end of the shaft $D$, which in turn carries the cam $E$. By such arrangement disc $O$ is so rotated in relation to the stitch-forming mechanism as to interpose its function as a stop during constantly recurring portions of the needle's movement. The disc $O$ has across its outer face an elongated recess $R$ (Figure 4), whose sides are sunk at right angles to the surface, but whose ends rise until they reach the disc surface where the disc has beveled edges $T$. In the normal, or straight-away, position of the mechanism of the machine, the disc, by its compressed spring, presses at the center of its recess against the pin $P$ attached to the lever $G$, which latter, as we have heretofore seen, when pulled, rocks the shaft $H$, which latter swings crank arm $L$, which throws the pivot $i$ into action and causes zigzag stitching. But it will be evident that, even if the lever $G$ be pulled, the pin $P$ cannot escape from the recess until the rotation of the disc brings the inclined recess ends opposite the pin. When this happens, the pin is drawn up the inclined ends and down the beveled side of the disc, and so long as the lever $G$ is kept depressed zigzag sewing continues. When the lever, which is depressed against spring pressure, is released, the pin $P$ follows the outer periphery of the disc until the rotation of the latter brings

its beveled edge opposite the pin, where it rises over the disc level, goes down the inclined end of the disc recess, rests in the center of the recess, and the swinging link becomes an idling member and straight-away stitching is resumed. It will thus be seen that the defendant's stop is carried by a moving part of the machine mechanism. The difference between it and the plaintiff's construction in that regard is that the moving part of defendant's mechanism produces a rotary movement of defendant's stop, while in complainant's it produces a thrust or horizontal movement. In both alike a cam, acting either directly or through an adjacent part, is the effective agency for producing the timed and timely stoppage which prevents sub-fabric needle shift. In both machines the actual shift of the pivoted member, which controls the vibrating mechanism, is brought about wholly by the operative, and is in no way dependent on the power supplied by the driving shaft of the machine. In both machines the vital operative element which enables both machines to prevent needle-shift when it is unsafe and permit it when safe is a stop carried by a moving part of the machine, for it is this feature that permits the safe synchronizing of needle-shift with timely stop release.

Such being the case, we are of opinion defendant has infringed the three claims of Woodward's patent, Nos. 27, 44, and 46, discussed, and we therefore direct a decree to be entered below adjudging their validity and directing an accounting.

---

⬤⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes