## LANSTON MONOTYPE MACH. CO. v. PITTSBURGH TYPE FOUNDERS' CO.

(Circuit Court of Appeals, Third Circuit. June 17, 1922. Rehearing Denied October 10, 1922.)

No. 2820.

1. Patents ☞328—1,222,415, claims 1 and 2, and 1,237,058, claims 4 and 6, for machine and process for making type metal elements for printing forms, held valid and infringed.

   Patent No. 1,222,415, claims 1 and 2, for apparatus for casting type metal elements for printing forms, and No. 1,237,058, claims 4 and 6, for the process and product of such casting, held valid and infringed.

2. Patents ☞165—"Claim" held surrender of everything without its limits and monopoly of everything within.

   A "claim" is a surrender to the public of everything outside its limits, and a monopoly of everything within its terms.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Claim.]

3. Patents ☞328—1,193,344, claim 13, and 1,193,388, claims 32, 38, for cutting mechanism for casting machine held invalid.

   The Bancroft and Endahl patent, No. 1,193,344, claim 13, and the Hockman patent, No. 1,193,388, claims 32 and 38, each for cutting mechanism for machines for casting printers' leads and rules, held not to involve invention and therefore invalid.

Appeal from the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Suit in equity by the Lanston Monotype Machine Company against the Pittsburgh Type Founders' Company. From a decree dismissing the bill (276 Fed. 921), plaintiff appeals. Decree sustained in part, and reversed in part.

Alexander S. Steuart and Melville Church, both of Washington, D. C., for appellant.

Tesse B. Fay and John F. Oberlin, both of Cleveland, Ohio, for appellee.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. [1] The invention involved in this case is a machine for making "leads" and "rules" of the particular size and character desired for the kind of printing in hand. These articles were usually of brass, but by using type metal, as these machines do, the leads and rules, instead of being picked out by hand, are simply turned back, with the type, into the melting pot. The machine has therefore given rise in the art to what is known as the "nondistribution" system. The mechanical making of such "leads" and "rules" was long desired, but was not done until the machine of the patent here involved was invented. As stated by the court below in its opinion, the defendant does not deny the presence of invention in plaintiff's disclosure, but contends that, when its claims are interpreted in the light of the prior art, the defendant does not infringe. It seems to us, however, that as this was the first machine to give the art machine-made "leads" and "rules," and that prior thereto any and all disclosures in the printing art did not teach or lead any inventor to produce such machine-made lead or rule, the invention disclosed is itself the beginning of machine-made leads and rules, and if the claims based on the plaintiff's specifications are plain in statement and embody the gist of the invention disclosed, such claims stand on their own bottom and are not lessened in scope by a supposed prior paper art, which in point of fact and accomplishment simply did not exist.

[2] Turning, then, to the claim, which is at once the surrender to the public of everything outside its limits and the monopoly of everything within its terms, we find the first claim of patent No. 1,222,415 is:

"An apparatus for *casting* type metal elements for printing forms, embodying means for confining molten metal, in contact with a surface of a previously congealed portion of the element being cast whereby the two portions are caused to unite by fusion, means for intermittently advancing the element with relation to the confining means as succeeding increments congeal, and means for forcibly injecting molten metal within the confining means to form succeeding increments of the element."

Analysis thereof shows the existence of three elements, viz.:

First, "means for confining molten metal in contact with a surface of a previously congealed portion of the element being cast, whereby the two portions are caused to unite by fusion;" second, "means for intermittently advancing the element with relation to the confining means as succeeding increments congeal;" and, third, "means for forcibly injecting molten metal within the confining means to form succeeding increments of the element."

Now, giving to one skilled in the art of type founding these three elements of metal feed, metal fusion, and metal movement, as the descriptive disclosures of the invention, let us inquire in what kind of mechanism would he put in practice the invention defined by the claim. Obviously, the basic thing is a mold of the desired pattern; but as by the claim this mold is a close or confining one, it follows that the incoming metal must by some means be injected into the mold. These features are required by the first claim, viz. "means for confining molten metal," and by the third claim for "forcibly injecting

molten metal within the confining means." Such being the requirement of the claims, it will be obvious to one skilled in the art that the particular means, viz. different types of pump, injectors, or even gravity pressure, by which the functional feature of injection is effected, is a mere engineering alternative, and that any such optional means would fall within the scope of the inclusive terms of the claim. It would likewise be clear to one skilled in the art that as a mold was used, and as molten type metal was put into the mold and solidified, leads and rules were to come out, and the working of the mold was continuous, that to secure such progressive action, the incoming fluid metal would be cooling and congealing as the process proceeded, and that some means were necessary to advance the congealed immobile portion in order to make room for the entry of the molten fluid supply. It would also be clear that whether such movement of the congealed element was effected by propulsion from behind or traction from before was an engineering alternative, and either or both modes of movement would fall within the inclusive terms of the claim, viz.:

"Means for intermittently advancing the element with relation to the confining means as succeeding increments congeal."

Such being the general functional features of the machine as carried into the claim, and such being the obvious latitude of mechanical alternative in effecting such functional features, we next inquire by what form of machine did the patentee show his invention could be worked. Without entering into details, we note that he showed a mold of the desired pattern, provided with an entrance for the incoming molten fluid type metal, and an exit for the congealed lead or type. In use, sufficient fluid entered the mold by pump pressure to fill it, and the fluid supply was then cut off and an appreciable time given the metal to congeal. By a properly synchronized mechanism, a ram or pusher then advanced and pushed the congealed increment forward to stop up the exit and void the chamber. By like properly synchronized mechanism the ram withdrew, the intake valve was opened, a fresh supply of molten fluid entered the chamber and came into fusing contact with the rear end of the advance congealed portion. As this entering batch of molten type metal entered the chamber, fused with the congealed element ahead and was itself progressively congealed, the pusher again came forward and repeated its described work. In this way the machine by successive steps or stages of congealing successive charges or increment, and by virtue of the fusion which took place between the incoming fluid and the ongoing congealed increment, produced and delivered from the exit of the mold a continuous strip of machine-made "leads" or "rules" of the desired pattern. This machine, embodying and illustrative of the claim quoted above, proved effective and gave to the art its first machine-made leads and rules, and enabled printing offices to themselves have the means to supply their own individual needs for such sizes and types of leads and rules as their business required.

Turning to the defendant's machine, we have reached three conclusions: First, that had it antedated the patent in suit, it would have anticipated the novelty of that patent's disclosure; second, if known to

the patentee he could have used it to illustrate his disclosure and illustrate the use of his invention; and, thirdly, to its parts, their functions and operation, could be applied the language and terms of the claim quoted. Indeed, to our mind this machine of the defendant is, in functional operation and theory, the same as the plaintiff's, in product substantially identical, and in means of an individual alternative, permissible under the broad definition of elements of the plaintiff's claim. To illustrate: The defendant has a closed mold. By means of a pump it injects molten metal into its closed mold. It forms in the mold successive congealed elements and advances them in relation to the mold. It is true its mold is of a different detail from plaintiff's, in that the intake end, instead of being intermittently closed by a mechanical valve, is kept constantly closed by the steady influx of fluid metal under pressure. But, with this structural difference, the union of the congealed element and the molten fluid element nevertheless conjunctly caused fusion in such a manner that the incoming fluid steadily and intermittently fuses into the congealed increment, with the result that there is a continuous intermittent advance through the mold of the confined and fusing elements of fluid and the congealed strata toward the outlet end of the mold, and consequently in the machine's production of a molded and finished strip of machine-made leads and rules.

It is true, also, that the defendant's machine is different from the plaintiff's in the means used to advance the congealed element, in that, while plaintiff effects this by propulsion from behind, defendant effects it by traction from the front. But it will be observed that the functional element is the fact of intermittent advance of the congealed element, which is common to both, and not the mere mechanical means by which such functional advance is effected. So, also, in regard to the contact blending of the congealed and the fluid elements in the two machines. The functional feature in that regard is the fusion action of the molten fluid on the congealed element after the intermittent dwell. The mere fact that in the plaintiff's machine the intermittent method of fluid intake allows the congealing element to congeal as a separate unit during the cut-off of the fluid advance, while in defendant's device the intermittent dwell of the fluid stream permits a zone of congealed element in front and a zone of molten fluid behind, and between them a zone of intermingled welding fluid and congealing element, is a mere alternative difference, and not one of function. In both there is equally present the pause or functional dwell, to permit congealing, and after the congealing pause the juxtaposition of molten and congealed elements, which permits and effects fusion, and consequently a continuity of unbroken strip output from the machine.

Such being the facts, as we view them, the defendant's machine being of a type that would have anticipated the plaintiff's invention, had it preceded it, it follows that, postdating it, it likewise infringes. So regarding it, it follows that the claims 1 and 2 of machine patent No. 1,222,415, and claims 4 and 6 of process patent No. 1,237,058, are valid and infringed. In these particulars the decree below will be vacated, and the cause remanded, with instructions to change the decree in accordance with this opinion.

[3] As to the part of the opinion below referring to the device which cut into suitable lengths the strips produced by defendant's machine, we concede to it the highest grade of mechanical construction, accurate exactness, and synchronism of the loading parts; but we have been unable to go further and find it involves invention. As to the patents for it, we are of opinion they lack validity, and as to them the bill should be dismissed.

In view of this opinion, in part sustaining and in part denying the relief sought by the bill, the costs in this court and in the court below are divided; defendant paying two-thirds, and plaintiff one-third.