## ALLEN et al. v. WINGERTER.

(Circuit Court of Appeals, Third Circuit. Feb. 25, 1927.)

No. 3562.

1. Patents ⊛⟶328—1,549,177, for apparatus for molding rubber articles, claims 2–5, 7–9, 12–16, held valid and infringed.

Allen patent, No. 1,549,177, for an apparatus for molding rubber articles, claims 2–5, 7–9, 12–16, held valid and infringed.

2. Patents ⊛⟶234—Infringement is not avoided by impairment of patented part in degree.

Infringement is not avoided by impairment of patented part, so long as distinguishing function is retained.

3. Patents ⊛⟶178—Courts apply doctrine of equivalents more liberally in case of meritorious invention.

The more meritorious an invention, the more liberal the courts are in applying the doctrine of equivalents.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

Suit by John F. Allen and others against George B. Wingerter, receiver of the Vulcan Rubber Company. From a decree of dismissal, plaintiffs appeal. Reversed, with directions.

Hugh C. Lord, of Erie, Pa., for appellants.

David P. Wolhaupter, of Washington, D. C., and H. M. Sturgeon, of Erie, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This appeal is from a decree of the District Court dismissing the plaintiff's bill on finding the patent valid but not infringed. The patent is No. 1,549,177, issued August 11, 1925, to J. F. Allen; the claims in suit are 2–5, 7–9, 12–16. The invention of the patent is an apparatus for molding rubber articles and particularly for making rubber receptacles for storage batteries arranged for conveniently loading the mold and conveniently discharging the article without distorting it.

Addressing our discussion to the making of rubber battery boxes, it should be observed that prior to Allen battery boxes were largely formed of wood in which were placed jars made of rubber, each jar containing a cell. The commercial manufacture of battery boxes entirely of rubber had, prior to Allen, made but slight progress, due to problems arising from the physical and chemical characteristics of that product. These, in the main, are the necessity of making a box with separate cell compartments under high pressure and high heat and removing it from the mold while still hot and still in a plastic condition. Every prior method had its drawbacks—high labor costs, wasted materials, large number of defectives. One method called for rubber sheeting for cell partitions; in another the molding was done in one apparatus, vulcanizing in a second apparatus and stripping or breaking out the box in a third apparatus. In still another method the box was formed in one part of the plant and vulcanizing done in another part. But in every apparatus of the prior art for making rubber battery boxes the side walls of the mold which sustain the pressure during vulcanizing were opened up laterally in disengaging the final product. This involved much labor and equipment and much loss from defective boxes with a corresponding increase of manufacturing costs.

Allen embraced all operations in one machine which turns out one completely molded and vulcanized battery box in 22 minutes. In commercial use they are arranged in groups, and a workman, moving from machine to machine and operating them in a cycle, can mold, vulcanize and unload nine fully completed battery boxes in that period.

The Allen machine has reduced labor two-thirds; it saves material; it reduces defectives; it vastly increases output and produces a cheaper and better finished product. It has gone into extensive use in the United States, Canada and England, yielding large royalties and turning out great numbers. We discern in the apparatus of the patent several old elements of the art, yet when assembled the apparatus became an entity which physically, functionally, and in the result attained was new and useful beyond comparison with anything that had gone before. Nothing in the prior practical art anticipates it. Nor do we think it is anticipated by the prior patented art, the principal patents now relied on having been references made by the Patent Office in the prosecution of the patent application. Though containing old elements, the device, when regarded as a whole, is new and very useful and shows invention in its structure. Thropp & Sons Co. v. De Laski & Thropp Circular Woven Tire Co. (C. C. A.) 226 F. 941, 947.

[1] We find all the claims in suit valid. Indeed, the respondent—though in his pleadings he defended on the invalidity of the patent—did not at the trial, nor does he now, challenge its validity but attacks its scope as being to narrow, when properly construed in

view of its disclosures and the prior patented art, to embrace his apparatus and therefore too narrow to be infringed by it.

On the issue of infringement the claims in suit may be separated into two groups: The first, referred to as primary claims, comprise the later claims 5, 12, 13, 14, 15 and 16; the second, referred to as secondary claims, comprise the former claims 2, 3, 4, 7, 8 and 9. The primary claims read squarely on the defendant's structure; the secondary claims, the defendant maintains, are limited to the precise structure shown in the drawings and disclosed in the specification, are entitled to no equivalents and are not open to the rule as to reversal of parts. As a corollary to this position the defendant maintained at the trial and the trial court, agreeing with him, held that the primary claims, though reading on the defendant's structure, are no broader than the secondary claims and that as those of the second group are restricted to the precise structure disclosed, so also are those of the first group, and, in consequence, none of the claims of either group is infringed by the defendant's machine.

That the apparatus of the defendant secures the novel results of the invention of the patent is not disputed. Whether it secures them in the same way by the same, or by permissibly equivalent, means will be our first point of inquiry. As the court held the broad claims of no greater breadth than the admittedly narrow claims, we shall for the moment address our discussion to the latter and determine whether the defendant has copied the construction of the invention by reversing its parts or by using equivalents.

In order to compare the contesting devices we must describe them in some detail. In the lower frame of the structure of the patent there is a ram on whose head is seated a battery mold with steam cavities in its walls. Into the mold a lump of crude rubber of proper size is placed. The ram, actuated by hydraulic pressure, thrusts the mold with its crude rubber telescopically against an overhanging core containing the requisite forms for making the walls and partitions of the battery box. Steam is then turned into the wall cavities, the rubber becomes fluid and runs into all the spaces made by the mold and core and, thus shaped, it is vulcanized under the high pressure exerted by the ram. This was old. The difference in the organization of these elements in the two machines is that Allen mounts the mold (containing crude rubber) on the ram and suspends the core from the upper frame; the defendant suspends the mold from the upper frame and mounts the core on the ram, a lump of crude rubber being placed on top of the core. In Allen's press the mold moves; in the defendant's press the core moves. Here is a precise reversal of parts and movement of both mold and core, each brought together and pressure maintained by similar ram action. In both, vulcanization is effected by steam circulating in the jacket of the mold.

Thus the battery box is formed; the trick was to get it, while still hot and plastic, away from the core and out of the mold. Allen gets the box away from the core first by providing a "steam cylinder (mounted) on the head" (claimed only in claim 1), or by "a fluid cylinder mounted on the head," or "power actuating means," or "means associated with" other means, differently phrased in various claims, to supply power and means to force a separation of mold and core. This is the first phase of a stripping action which is the center of the inventive conception. There was nothing like it in the battery box art. Both structures have it. Next, from the upper power generating cylinder in the plaintiff's press a piston is driven downwardly and with it is a rod (through which, according to claim 1, steam may flow to the mold) extending against the ram. By this motion the ram and mold are driven away from the core, but the box, hot and plastic, is still in the mold. To obtain the same breaking-away action of mold and core the defendant provides a descending hydraulically driven piston or rod, though not associated with or extending against the ram. Otherwise he effects a separation of mold from the core in substantially the same way, and then he, too, still has the problem of getting the box out of the mold. To achieve this—the third phase of the stripping action —Allen makes the piston-driven-box-containing mold encounter in its descent an ejector rod thrust beneath its bottom. This rod ejects the box from the mold. It may then be lifted without injury or distortion and set aside to cool. The defendant, doing the same thing, provides a rod to descend against the bottom of the suspended mold (the reverse of Allen), which jars and pushes the box from the mold downwardly (again the reverse of Allen), and in this way, like in Allen, the box comes out ready to be set aside to cool.

Functionally every advantage obtained by the Allen press is obtained by the defendant's press in the same measure, by the same or similar means in the same or in reverse position, and (with one exception) in the same manner. That exception omits Allen's piston and rod of the patent as a member extending against the ram to force a return of the ram

and to break the mold from the core. The defendant has a piston or rod, not connected with the ram, but intended otherwise to do, and actually doing, the same thing. By this difference it seeks to escape infringement on a limitation of the narrow claims to the precise structure disclosed, that is, (as claimed only by claim 1), a permanent tying of the ram to the pistol in a constantly charged steam cylinder, and a limitation of the broad claims to the narrow ones.

[2] The expression "reversal of parts" is not regarded as meaning literally a precise opposite positioning of all the parts of a patented invention. New parts differently positioned may be found in an infringing device which perform the functions and produce the results of parts of the invention, yet the device of a patent and an infringing device may not show any physical resemblance one to the other. This was particularly true of the contesting devices in Union Special Machine Co. v. Singer Machine Co. (C. C. A.) 227 F. 858. Placed side by side they looked wholly unlike, yet the theory of the invention could, after study, be traced and found in the wholly dissimilar parts of the infringing machine and there could be discerned the capital idea of the patent, which was a stop carried on a moving part of a sewing machine which prevented an unsafe needle shift when in the fabric and permitted a safe shift when out of the fabric. And so here, we can trace and find in the defendant's device the capital idea of the inventor with means in changed positions—with the partial omission of one. That, we repeat, is the means for breaking the mold from the core and stripping the rubber boxes from the mold. In respect to that one difference the defendant has supplied a mechanism which does not go quite as far in its relation to other mechanism as that of the patented device, thus diminishing the utility and detracting from the full performance of the latter; yet it functions in substantially the same way, though in reversed position, and produces the same result—the one most essential in the production of rubber battery boxes and the one without which the whole mechanism of either machine would be worthless. So constructed we think this part of the defendant's press comes within the settled rule that infringement is not avoided by impairment of a patented part in degree so long as the distinguishing function is retained. Penfield v. Chambers, 92 F. 630, 653 (C. C. A. 6th); Murray v. Detroit Wire Spring Co., 206 F. 465, 468 (C. C. A. 6th).

[3] On the subject of equivalents we apply the customary tests, namely, identity of function and substantial identity of way of performing that function. Walker on Patents, §§ 350–366. We are, of course, not unmindful that these tests make valid responses only according to the character of the invention, that is, whether the invention is primary or only a slight improvement in a crowded art, or whether it holds a place between those extremes. The law recognizes that the more meritorious an invention is, the greater the step in the art, and, correspondingly, the more liberal are the courts in applying the doctrine of equivalents. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523; Lanston Monotype Co. v. Pittsburgh Type-Foundries' Co., 283 F. 713, 716 (C. C. A. 3d); Los Angeles Art Organ Co. v. Æolian Co. (C. C. A.) 143 F. 880, 885; Ironclad Mfg. Co. v. Dairyman's Mfg. Co. (C. C. A.) 143 F. 512.

The prior art patents, Hayward, Kelly, Brink and Weida, all conceded to be the best of the prior art, lack the mechanism of the invention of the patent in suit for stripping the lining from the mold. The patent nearest the patent in suit was granted to Kelly in 1885 for a press for forming heels for India rubber boots or shoes. It expired in 1902 at about the beginning of the automobile industry; yet, since its expiration, it has suggested to no one that it contained features which, rearranged and assembled with others, might produce rubber battery boxes. It wholly lacked separable liners. Allen, as late as 1925, though not the first to produce rubber battery boxes, was the first to organize a machine which, in one operation, would mechanically and economically turn them out in numbers commercially profitable. We think it involved a meritorious invention and is therefore entitled to equivalents which, without determining the precise range, embrace the mechanism of the defendant's structure.

Finally, we come to the main contention of the defendant and the main ground for the court's decision against infringement, which is that the broad claims, though reading on the alleged infringing machine, are no broader than the narrow claims, for both alike are limited to the one device specifically disclosed by the drawings and described by the specification, and that, this being true, no claim of either group is infringed. In so holding, the court based its action on the case of Courson v. Westinghouse Air Brake Co., 263 F. 89 (C. C. A. 3d), and on words of the opinion (263 F. 92) which, interpreted in a digest of patent cases, were made to read: "Broad and narrow claims are to be construed of the same scope where only one type of construction is

disclosed." This interpretation or transformation of our opinion into a broad general statement of law was unfortunate, for in that case we held and intended to convey the thought that under the patent there in suit, where location was of the substance of the invention, the broad claims were of no greater breadth than the narrow ones because the invention related solely to a friction gear for railroad cars and the patent limited the invention to a stationary friction member fixed and recessed in the car frame. We did not hold there was no difference between narrow and broad claims for a device so positioned but held that as the invention had to do with car friction members solely in that place, all claims had to be read in the light of the invention so disclosed. But in the instant case the patent, by diagram and specification, shows a general structure, and, by varied claims intended to be read in connection with what had gone before, discloses and claims varied constructions of that device. These variations of disclosure show variations of structure, as where in claim 1 the inventor disclosed and claimed a "piston in the cylinder and a hollow piston rod extending from the piston to the ram conveying steam to the mold" and in claim 2 the inventor, abandoning means for conveying steam to the mold and permitting it to be conveyed as the user pleased, provided merely a rod extending against the ram to force the mold from the core. These two claims in the second group show different things in respect to the same structure and may be valid. Certainly claim 1 is not the measure of the patent. Contrasting the claims of the different groups, claim 1, as we have said, provides a steam conveyance to the mold; claim 14 does not; yet both on their own disclosures, when read in connection with the device described, may be valid. And so broad claim 14 of the first group discloses a structure new to the art which, viewed in connection with the diagram and specification, will, when followed element by element, produce the structure of the novelty and utility of the invention, just as the defendant has done. Unlike the broad claims of the Courson patent for a draft gear positioned in one specified place, the broad claims of the Allen patent cover the general organization of a structure embodying the inventor's concept and it does it in a way that informs those skilled in the art, just as it informed the defendant. Regarding this to be the disclosure of the patent when read as a whole, International Banding Mach. Co. v. American Bander Co. (C. C. A.) 9 F.(2d) 607, 608, we are constrained to find that the learned trial judge, misconceiving language of ours which, perhaps, was not entirely clear, fell into error in not giving the claims of the first group their proper breadth and in withholding from the claims of the second group proper equivalents.

On the issues of estoppel by the plaintiff through Patent Office rejection of claims first applied for, of estoppel to claim in the amended claims any broad feature of his invention, of amendments allowed by the Patent Office without supporting affidavits, and of prior knowledge on the part of the Vulcan Rubber Company, we hold against the defendant.

The decree below is reversed with direction that the bill be reinstated and a decree entered for the plaintiff holding the claims of the patent in suit valid and infringed and that the case proceed to an accounting.