**GORDON FORM LATHE CO. v. WALCOTT MACH. CO.**

Circuit Court of Appeals, Sixth Circuit.
April 12, 1929.

No. 5111.

F. O. Richey, of Cleveland, Ohio (John W. Michael and Bottum, Hudnall, Lecher, McNamara & Michael, all of Milwaukee, Wis., and Richey & Watts, of Cleveland, Ohio, on the brief), for appellant.

J. L. Stackpole, of Boston, Mass. (Otis A. Earl, of Kalamazoo, Mich., and H. L. Kirkpatrick, of Boston, Mass., on the brief), for appellee.

Before MOORMAN, HICKENLOOPER, and KNAPPEN, Circuit Judges.

HICKENLOOPER, Circuit Judge. The appellant originally instituted its action in equity in the District Court for an injunction and accounting for alleged infringement of patent No. 1,542,803, issued June 16, 1925, upon application of Charles Gordon and Alfred W. Redlin, filed July 19, 1920, for a lathe. The District Court found the claims in issue valid, but not infringed. The parties to this appeal will be referred to by the designations of complainant and defendant, by which they were known in the court below. Claims 1, 2, 12, 23, 24, 28–30, 33, 34, and 39–42 are in issue.

The patent in suit relates particularly to lathes for turning irregular or noncircular bodies of metal, such as cams, cheek pieces of cranks, etc., otherwise referred to by counsel as nongeometric figures. The separate units of the machine are designed with a view to arrangement in rank and the turning, in one operation, of the multiple cams on an automobile cam shaft. The patent is here attacked as void for want of invention, and, if valid, lack of infringement is urged in defense. The claim of invention is predicated both upon the aggregate organization of the separate units in rank and upon the combination of means for the operation of the single unit. It is apparent, however, that unless invention exists in organizing the single unit, the mere arrangement of such units in rank, so as to work simultaneously upon a number of different cams mounted upon a single shaft, would not constitute such invention. We are therefore primarily concerned with the question of invention, as it relates to the separate unit of the complainant's machine,

and, if the patent be found valid, then with the question of infringement by the defendant's machine.

Prior to about 1920 such cams were cast and then rough-ground to approximate dimensions. They were then case-hardened and reground to accurate dimensions. Such grinding operations were expensive, dirty, and to some extent dangerous, and Gordon conceived the idea of substituting a turning operation for the initial rough-grinding. After hardening, the steel cannot be turned, and the final or finishing grinding operation is still practiced. In order to successfully accomplish the turning operation upon a revolving blank, the work being revolved and moved transversely of the cutting tool, the tool must of necessity be moved forward and back in a plane transverse the axis of the work, so as to trace the outline of the finished cam or other work; and such tool must likewise be oscillated in the plane of its reciprocating movement, so that it may always maintain the substantially normal cutting angle in relation to the surface of the work, and neither skip and scrape, nor gouge or "hog," such work.

To accomplish these results, Gordon and Redlin provided two cams adjacently mounted upon a shaft turned in synchronism with the revolution of the work. Independent of these cams, but suitably placed, a plate or flat rocker arm, referred to as the frame, was pivotally suspended from a supporting shaft. This permitted of a swinging movement to and from the work. To this frame was affixed a roller bearing contacting with one of the cams, and a spring tending to draw the frame toward such cam and to hold said roller in contact therewith. The tool holder was also mounted on the frame adjacent to the work, and the angularity of the tool to the work was controlled by the other cam and a bell crank lever, with roller bearing and spring adapted to hold such bearing upon its cam. Neither of the controlling cams were replicas of the work to be cut, but both were more or less arbitrarily designed to accomplish the dual purpose of swinging the tool to and from the axis of the work, and of oscillating the tool at or near its cutting edge, so that the normal angle of the tool to the work might be continuously maintained.

Of the claims in issue, claims 1, 2, 28, 29, 30, 33, 34, 39, 40, 41, and 42 relate to the tool-moving and tool-tilting mechanism above described. Claims 12, 23, and 24 relate to matters of general organization and automatic stopping means, and the subject-matter of these claims was not pressed upon argument, is said not to be incorporated in defendant's machine, and is not here considered. Of the claims relating to tool-moving and tilting mechanism, claim 2 is admittedly typical and reads:

"2. In a lathe the combination of a rotary work holder, a tool holder provided with a cutting tool, movable towards and from the axial line of the work holder and angularly adjustable in a plane transverse to the axis of the work holder, cams adapted to vary the distance between the point of the tool and the axial line of the work holder, and to vary the adjustment of the tool for maintaining proper cutting and clearance angles of the tool to work of noncircular contour, means for synchronously rotating the work holder and cams, and means for simultaneously causing relative movement between the work holder and tool holder axially with relation to the work holder."

The Gordon and Redlin lathe obviously has its limitations and its disadvantages, if not defects. The tool is pivoted at, or substantially at, its point, thus requiring it to turn too rapidly and over too great an arc when cutting long-nosed or sharp-pointed cams. This makes it impossible for the tool to follow at normal angularity the desired contour immediately after turning such sharp nose, and there exists a tendency to leave excess metal on the far side of the point. The necessities of commercial construction and the use of the roller upon the tool-reciprocating cam, in which a depression or hollow is used to withdraw the tool from the center of rotation of the work, likewise limits the extent to which the tool can be withdrawn from the axis of the work, and thus limits the length of the nose or irregular projection which the device can cut, as a practical matter. Notwithstanding these defects and limitations, a comparatively large number of the machines have been marketed commercially, a great many cams and crank cheeks have been successfully turned, and some of such machines are still rendering satisfactory service. The general utility of the device as a commercial and operating machine would seem to be established, and, if it has been supplanted, it is more probable that this was due to the development of the defendant's machine, which avoids some of the disadvantages of, and does some types of work better than, the complainant's machine. On the degree of operability necessary, see Hildreth v. Mastoras, 257 U. S. 27, 34, 42 S. Ct. 20 (66 L. Ed. 112).

The broader claims of complainant's patent, numbered 2, 28, and 29, have been the

subject of direct adversary contest between the complainant and H. W. Melling, inventor of defendant's machine, in several other tribunals. During pendency of the Gordon application in the Patent Office, Melling filed his application for patent upon the alleged infringing machine, February 27, 1923. A patent, No. 1,512,995, subsequently issued October 28, 1924, and defendant's machine is fully described therein. An interference was delared, and the interference proceedings passed successively to decision before the Law Examiner, the Examiner of Interferences, the Examiners in Chief, the Commissioner of Patents, and the Court of Appeals of the District of Columbia. In each of these tribunals priority of invention of the claims in interference was awarded to Gordon and Redlin. Melling thereupon brought action under R. S. § 4915 (35 USCA § 63), in the District Court for the Northern District of Ohio, making the complainant here defendant therein. The issue thus raised was again decided in favor of Gordon and Redlin. 14 F.(2d) 437. In all of these proceedings, and especially in the last mentioned, the question of patentable novelty was directly presented to the attention and consideration of the several tribunals. Cf. Palmer Pneumatic Tire Co. v. Lozier, 90 F. 732, 736 (C. C. A. 6). The prior art was fully considered. The interference was not dissolved for want of patentable novelty, and the bill under R. S. § 4915, was not dismissed for that reason. While all this may go no further than to bind the parties upon the question of priority of invention, unless there is "thorough conviction to the contrary" (Haughey v. Lee, 151 U. S. 282, 285, 14 S. Ct. 331 [38 L. Ed. 162]; Computing Scale Co. v. Standard Scale Co., 195 F. 508, 515, 516 [C. C. A. 6]), yet it greatly strengthens the presumption of patentability which arises from the issue of the patent to complainant (Hildreth v. Mastoras, supra, at page 32 of 257 U. S. [42 S. Ct. 20]).

A definition of what we conceive to be the true inventive step of Gordon and Redlin, in the light of prior practices and in view of the prior art patents, at once disposes of the question of anticipation and confirms us in the opinion held by all other tribunals considering the question, including the District Court in this action, that invention is disclosed by the patent to complainant. In determining such inventive step, the court must first look to the state of the art. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322 (67 L. Ed. 523). The prior art patents most strongly relied upon, and clearly the most pertinent, are those to Brophy, No. 649,905, May 22, 1900, and Montreuil, No. 701,217, May 27, 1902.

The patent to Montreuil related particularly to turning articles of elliptical form in cross-section. By the employment of a sliding tool support as a part of two pantographs, tied together by link arrangement and moved by an eccentric of proper size, making two revolutions to each revolution of the work, the tool was made to traverse a circular orbit in synchronism with the revolution of the work, and at the same time to maintain substantially the normal angularity to the work. By the means employed the Montreuil lathe could turn only an ellipse, and the patent neither suggests nor discloses means for turning an irregular or nongeometric figure. The patent does suggest the necessary function of tool movement, reciprocating in a plane perpendicular to the axis of the work, with the maintenance of the normal angularity of tool to work, but manifestly no patent may issue for these functions, but only for the means or elements of the machine by which the result is accomplished.

The same observations are applicable to the patent to Brophy. This invention related to an attachment for automatic lathes, and had for its object the provision of mechanism for cutting eccentric grooves in a metal blank. During the initial period of operation the Brophy lathe operated as the ordinary engine lathe. Such operation was continued until the point was reached at which it was desired to cut the eccentric; that is, until metal had been cut away from the outer circumference of the blank to the outer point of the circumference of the eccentric, and thereafter crescents were cut from the blank, opposite the outer point of the circumference of the eccentric, by employing a spring and cam to force the tool forward upon rotation of the work. Since the eccentric thus being formed passed in a circular orbit about the axis of the revolving work, it likewise became necessary for the cutting edge of the tool to perform an orbit, and this was accomplished, and substantially normal angularity to the work was maintained, by the use of an eccentric cam to tilt the tool holder synchronously with its reciprocatory movement and the revolution of the work. This patent also recognizes the necessity of synchronous reciprocatory movement of the tool and an oscillation of the tool to maintain its normal angularity to the work. Brophy neither suggests nor disclos-

es means for cutting other than an eccentric of geometric form:

The patents to Huston, No. 494,864, and to Diehl, No. 607,987, more remotely pertinent, are for metal cutting mechanisms of the boring mill type. In Huston the tilting of the tool to maintain the normal cutting angle is not considered a necessary function, but the use of cams to control the path of the tool in conjunction with a turning of the tool upon its axis vertical to the surface to be cut is disclosed. The same necessity of turning the tool to cut an ellipse in a plate upon a revolving work table is disclosed in the patent to Diehl, and by Diehl this result is accomplished by the use of an eccentric, instead of the cams of Huston. Neither Huston nor Diehl discloses the Gordon mechanism.

In none of the patents cited is any effort shown to devise, or disclosure made of, means for oscillating the tool, in synchronism with its reciprocatory movements and the revolution of the work, by the use of an appropriately shaped cam, movable frame, and bell crank lever tool support. None contemplates the turning of irregular or nongeometric forms. Those patents cannot be considered as anticipations which do not disclose the purpose, means, and mechanism for accomplishing the end of the patent in suit, and which are restricted, by the mechanisms disclosed, to the accomplishment only of a substantially different and limited purpose. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 66, 43 S. Ct. 322 (67 L. Ed. 523); Canada et al. v. Michigan M. Iron Co., 124 F. 486, 493 (C. C. A. 6); Munising Paper Co. v. American Sulphite Pulp Co., 228 F. 700, 703 (C. C. A. 6); Hobbs et al. v. Beach, 180 U. S. 383–392, 21 S. Ct. 409 (45 L. Ed. 586); Fulton Co. v. Bishop & Babcock Co., 284 F. 774, 777 (C. C. A. 6). Cf. Outlook Envelope Co. v. General Paper Goods Mfg. Co., 239 F. 877 (C. C. A. 2). It is true that the mechanism of the Brophy patent can be so reorganized as to cut a cam or other nongeometric figure, but this is done only by substituting for the eccentrics of Brophy the more or less arbitrarily shaped and specially designed separate control cams of the patent in suit. Such reorganization constitutes incorporating into the machine of Brophy the essence of the Gordon invention to accomplish the Gordon result. Such an organization was neither conceived nor disclosed by Brophy, and the possibility of reorganization, so as to reveal in the machine of Brophy the actual disclosures of Gordon, will not convert the patent to Brophy into an anticipation. Cf. Topliff v. Topliff, 145 U. S. 156, 161, 12 S. Ct. 825 (36 L. Ed. 658); Clough v. Barker, 106 U. S. 166, 175, 1 S. Ct. 188 (27 L. Ed. 134); Rockwood v. General Fire Extinguisher Co., 8 F.(2d) 682–686 (C. C. A. 2); Block v. Nathan Anklet Support Co., 9 F.(2d) 311, 312 (C. C. A. 2). As stated by the District Judge, the reorganization itself "indicated inventive thought."

If we are to look to the prior art and the specifications to determine the true nature of the invention, the precise inventive step of Gordon and Redlin would seem to lie in combining with the means for producing reciprocatory movement of the tool, old in the art, the means for controlling the oscillatory movement of such tool by a separate and specially designed cam, spring, and bell crank lever, in such organization that the means for both reciprocatory and oscillating movement, working in synchronism with each other and with the rotation of the work, could cut a cam, crank cheek, or other non-geometric form. Although the demand for such a machine tool had long existed, such combination had not before occurred to any one. The devices of Brophy and Montreuil, though adaptable, were not accepted by the trade and so adapted. Such fact strongly indicates that the changes were not obvious and involved more than mechanical skill. Potts & Co. v. Creager, 155 U. S. 597, 15 S. Ct. 194, 39 L. Ed. 275; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527.

The present patent is in a very true sense generic, and the patentee a pioneer in this particular branch of the art. The machine had commercial utility and was accepted by the trade, and its manufacture was reasonably successful until thrown into competition with the infringing machine, which avoided the chief defect, heretofore mentioned, and did not have some of the limitations of the patented device. The claims of the patent in suit were considered as entitled to broad, liberal construction in the Patent Office proceedings, by Judge Westenhaver in the proceedings under R. S. § 4915, and by the District Judge below. We think that such claims are entitled to this liberal construction, and concur in the opinion of the other tribunals that the patent discloses invention and is not anticipated, and that the generic claims are valid.

We then turn to the question of infringement. It is in evidence that Melling, the designer of defendant's machine, was called upon as an expert in mechanics to inspect one

of the complainant's machines in operation at the plant of the Jackson Motor Shaft Company. Upon arrival he found that the tool left "a lump on the work just below the nose of the cam" by reason of the rapidity with which the tool oscillated on turning the nose, and that the noise and jar of the bell crank lever falling upon the cam controlling this motion was such as to convince him that the design was impractical. Melling then went to his shop and with sketch and model cams, plates, and rollers, commenced to experiment for the adaptation of the principle of the Blanchard lathe to supply the reciprocating motion of the tool.

The Blanchard lathe was old in the art, and while it itself had been used exclusively in wood-turning operations, the principle of the Blanchard lathe had been used in the rough-grinding of cams prior to Gordon. In the Blanchard lathes a pattern is used of the precise shape and dimensions of the cross-section of the finished work. The cutting means used is a circular cutter with multiple teeth, or, in the grinding operations, a grinding wheel. This cutter is mounted adjacent the work upon one end of a reciprocating carriage or frame. On the other end of this frame is mounted a circular and revolvable guide plate bearing upon the pattern cam. The distances between the axes of the pattern cam and the work is the same as that between the axes of the cutter and the guide plate. The work and pattern are on the same relative sides of cutter and guide. The guide plate is held firmly against the pattern cam by spring tension, and the reciprocatory movement of the cutter to and from the work, to produce in the work a replica of the pattern, is thus produced by equality of revolution of the work and pattern cam.

successively maintain the same relative position on the work as the point of contact of the guide plate maintains on the pattern cam. It is also obvious that, where the pattern used is cam-shaped or irregular in design, the point of contact between the nose of the cam and the guide plate, and hence the point of cut on the work, will at times be above and at times below the plane of the axes of the work, cutter, pattern, and guide.

It is insisted that Melling simply applied the principle of the Blanchard lathe in designing his machine, substituting a single oscillating tool for the revolving circular cutter of the Blanchard lathe, and that by reason of the adoption of the principle of the Blanchard lathe, the tool being pivoted at a point the same distance from its cutting edge as the radius of the circular guide plate (assumed to be substantially remote from the cutting edge), the size of the arc through which the tool must oscillate in passing over the nose of the cam is very materially reduced, and the fact that the tool follows the point of the cam from above the horizontal plane, around the point and down below the horizontal plane, so far reduces the speed required in making the turn, and the jar of the bell crank lever roller upon the control cam, as to make a practical success of the Melling machine and avoid the features of disadvantage in the Gordon machine. Thus it is urged that the Gordon and Melling machines operate upon entirely different principles, the tool of Gordon tilting upon its cutting edge, while the tool of Melling oscillates upon a point remote from such cutting edge; the cutting edge of the tool of Gordon reciprocating substantially in a straight line, the edge of the Melling tool traveling in a marked orbit; and the lathe of Melling following the teachings especially of the Blanchard lathe, with the or-

## BLANCHARD

 

The use of the Blanchard lathe, as such, involves no question of oscillation of the cutting tool. It is obvious that in order to produce in the work, in cross-section, a replica of the pattern cam, the diameter of the circle traveled by the teeth of the revolving cutter must be exactly the same as the diameter of the circular guide plate. Thus, as the pattern cam and work are revolved at equal speed, the cutting edges of the tool

bital movement of the tool of Brophy and Montreuil, while Gordon and Redlin take a step backward in the art by abandoning such orbital movement of the tool, except to an infinitesimal, theoretical degree.

The above-quoted claim unquestionably reads upon the defendant's machine, and if we go further, and compare the operative parts of the two machines, we find the same essential elements in both. As said by the

Law Examiner in the Patent Office interference proceedings: "Each machine comprises, as its essential elements, a rotary work holder, a cutting tool, a tool-supporting member movable transversely to the work holder, a tool holder adjustably mounted on the tool-supporting member, work-shaping and tool-adjusting cams co-operating with the tool-supporting member and the tool holder, respectively, to vary the distance between the tool and the axis of the work holder, and to control the angular relation of the tool to the work, and means for rotating the work holder and the cams synchronously. And in each machine the cam that moves the tool-supporting member towards and from the work holder is so shaped as to give the desired form to the work." To this definition of similarity of means might be added that in both we find the bell crank lever with its roller bearing as the means of transmitting the oscillatory movement from the control cam to the tool.

The fact that in Melling the tool-supporting member is apparently pivoted at a point remote from the cutting edge of the tool is immaterial in principle, since the point of pivot is controlled entirely by the size of the circular guide plate which is used. Convert such guide plate into a revolving pin of small dimensions, and the point of pivot would be brought substantially to the point of cut. The Melling machine would then be able to cut a design with hollow or dimple, which it cannot now do. The fact that the bell crank lever and control cam would then have to be redesigned, and the objection that the Melling machine would then be subject to the same disadvantages or defects as the Gordon machine, do not detract from the position that in principle the functions and the elements of the two machines are substantially the same. This is the more apparent when applied to the difference in the pattern cams used to control the line of cut. In the Melling machine the pattern is a replica of the finished work, and the spring tension impels the frame toward the work, holding the guide plate firmly against the pattern. In the complainant's machine the work and pattern cam are on opposite sides, respectively, of the tool and the roller member controlling the reciprocatory movement. The spring urges the frame away from the work, thus holding the bearing tightly against the pattern cam. In the complainant's machine, therefore, the pattern cam is not a replica, but substantially the reverse in shape, to the pattern of Melling. The principles, however, are identical.

Melling did not pattern his machine upon the Blanchard lathe, in so far as the tilting of the tool was concerned, for the principle of the Blanchard lathe contemplated only a revolving circular cutter head. The only suggestion drawn by Melling from the Blanchard lathe lay in the observation that in a design of that type the radius of the circular cutter at the point of cut was always perpendicular to the tangent of the work—the ideal result—and that the arc of oscillation of the point of cut from above the horizontal plane, around the nose of the cam, and thence beneath such plane, was of much less degree than the arc of oscillation necessary in complainant's design. This observation did not solve the problem.

The principle of the Blanchard lathe produced reciprocating movement only, which was inoperative to cut with a single tool a nongeometric figure upon the revolving work, unless the tool were also given oscillating movement to maintain the normal angularity of the tool to the work. To produce this oscillation Melling turned to and appropriated the cam and bell crank lever construction of the complainant, thus producing the desired end by practically identical means used by Gordon. Morley Machine Co. v. Lancaster, 129 U. S. 263–281, 9 S. Ct. 299 (32 L. Ed. 715); Cimiotti Unhairing Co. v. American Unhairing Machine Co., 115 F. 498–504 (C. C. A. 2); Lourie Implement Co. v. Lenhart, 130 F. 122, 129 (C. C. A. 8). This fact was suggested by the court below when the witness Melling was asked: "Well, didn't you get the suggestion of mounting the single cutter on an arm that in some way would rock, changing the relation of the cutter to the tangent of the work, from the Gordon and Redlin machine?" This question was not satisfactorily answered, and it is at least worthy of note that the means used bear such close functional and physical relationship to those employed by Gordon and Redlin, and that the organization involving their use did not occur to Melling until after he had inspected the complainant's machine in operation.

As we have said, the elements of cam and bell crank lever to rock the tool, in combination with means for reciprocatory motion of the tool, constituted the essence of Gordon's inventive step. The patent is considered by us as a primary or generic one, and the claims are entitled to great liberality of construction. Doubtless the use of the Blanchard lathe principle to produce reciprocatory movement, the use of the circular guide plate of relatively large proportions, as com-

pared with the work, and the resulting pivoting of the tool at a point substantially removed from its point, was a valuable improvement, which perhaps was patentable as such. But superiority of operation does not, of necessity, negative infringement. Schiebel Toy, etc., Co. v. Clark, 217 F. 760, 771; Toledo Mach. & Tool Co. v. E. W. Bliss Co., 287 F. 443, 447 (both C. C. A. 6). Applying the doctrine of broad equivalents properly applicable to generic patents, the variation between the conceptions of Gordon and Melling did not take the machines of Melling out of the domination of the claims awarded to Gordon and Redlin. Hildreth v. Mastoras, 257 U. S. 27, 36, 42 S. Ct. 20 (66 L. Ed. 112); Temco Electric Motor Co. v. Apco Mfg. Co., 275 U. S. 319, 328, 48 S. Ct. 170 (72 L. Ed. 298); Hoyt v. Horne, 145 U. S. 302, 309, 12 S. Ct. 922 (36 L. Ed. 713); Otto Coking Co. v. Koppers Co., 258 F. 122–135 (C. C. A. 3).

Tersely expressed, our opinion is that Melling accomplished the same result as Gordon, perhaps more efficiently mechanically, but nevertheless by the employment of substantially the same means, or their equivalents, operating in substantially the same manner. This has universally been held to constitute infringement, and we so hold. Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 568, 569, 18 S. Ct. 707 (42 L. Ed. 1136); Schiebel Toy & Novelty Co. v. Clark, supra; Allen v. Wingerter, 17 F.(2d) 745, 747 (C. C. A. 3). Such decision is, of course, applicable to both defendant's cam cutting and crank shaft contour lathes, in both of which the patented combination of elements appears.

The judgment is reversed, so far as the finding of noninfringement is concerned, and the cause is remanded for further proceedings consistent with this opinion.