## ANDERSON & WRITER CORPORATION v. HANKY BERET, Inc., et al.

### No. 350.

Circuit Court of Appeals, Second Circuit.
April 4, 1932.

168

See also (D. C.) 36 F.(2d) 412; (C. C. A.) 40 F.(2d) 196.

O. Ellery Edwards, of New York City, for appellants.

Kenyon & Kenyon, of New York City (Wm. Houston Kenyon and W. Houston Kenyon, Jr., both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The patent in suit relates to a process for making berets out of one piece of cloth and to a machine by means of which it is done. The process claim involved is No. 7, and reads as follows:

"7. The method of producing tam-o'-shanters or the like from a sheet of material, comprising the steps of folding the outer portions of the material inwardly toward its center and holding the marginal edge of the folded material against contraction, pulling the free inner end of the material inwardly from the marginal edge, and subjecting the folded material to the action of pressure in the presence of heat and moisture."

Claims 8, 9, 10, and 11, for the machine, are:

"8. A machine for making tam-o'-shanters or the like, comprising a lower die having a base and an upstanding flange defining the effective area of the base, an upper die for movement within the flange of the lower die and having an opening extending therethrough and spaced from its outer marginal edge, a separate shaping element adapted for insertion within the flange of the lower die and adapted to have the material of the article folded over the same and serving to hold the marginal edge of the material against contraction, the opening in the upper die affording access to the free inner end of the material whereby it may be pulled inwardly from the marginal edge, means to effect a relative closing movement between the dies, and means to heat one die.

"9. A machine for making tam-o'-shanters or the like, comprising a lower die having a substantially flat face and an upstanding flange at its outer edge, an upper die for movement within the flange of the lower die and having an opening extending therethrough and spaced from its marginal edge, a separate shaping element adapted for insertion within the flange of the lower die and adapted to have the material of the article folded over the same and serving to hold the marginal edge of the material against contraction, the opening in the upper die affording access to the free inner end of the material whereby it may be pulled inwardly from the marginal edge, means to effect a relative closing movement between the dies, and means to heat one die.

"10. A machine for making tam-o'-shanters or the like, comprising a lower female die having a recess to bodily receive the article being formed, an upper male die to enter the female die and having an opening formed there-through which is spaced from its marginal edge, a separate shaping element for insertion within the female die and adapted to have the material of the article folded over the same to define the marginal edge of the article, the opening in the male die affording access to the free inner edge of such material for pulling action, means to effect a relative closing movement between the dies and means to heat one die.

"11. In a machine for making tam-o'-shanters or the like, a lower die, an upper die for co-action therewith and having an opening formed therethrough and spaced from its marginal edge, a shaping element to be removably mounted between said dies and adapted to have the material of the article folded about the same, said shaping element having a diameter approximating that of the upper die whereby the outer edge of the shaping element is disposed adjacent to the outer edge of the upper die and remote from the opening of the upper die, the opening in the upper die affording access to the free inner edge of the material for pulling action, means to heat one die, and means to effect a relative closing movement between the dies."

When this patent was previously before us on an appeal from an order granting a preliminary injunction, the questions of validity and infringement were expressly left for final hearing, though the order appealed from was reversed. The process was there fully and accurately described. Anderson & Writer Corporation v. Hanky Beret, Inc., et al., 40 F.(2d) 196. It now appears from the answers to the interrogatories that there is no substantial issue as to infringement. We accept that to have been established, and take up the issue as to validity.

The problem presented to Writer was that of making a beret out of one piece of material and in such a way that it would be free from wrinkles. Not less important from a practical commercial standpoint was a reduction in waste both of material and time.

After conducting various experiments, he found that a suitable machine to do what was wanted could be constructed by using what might be called three major elements—an upper die, a lower die, and a plate to use as a form over which the material was stretched. So far there was nothing new. What he did discover lay in the fact that, when the moistened material stretched over the form plate was put between the upper and lower dies, heat applied to both of these dies and the material subjected, while stretched on the plate, to pressure from the heated dies above and below, the beret was quickly formed and dried into a permanent smoothness in the desired shape. It could then be removed from the plate and such additional attention given to it without waiting for any further drying as would make it ready for shipment to the buyer. The virtue in the process lay in the fact that a beret could be made out of one piece, without wrinkles and with a minimum of waste of material and time. The result was economy in manufacture. The inventive thought which produced the machine for the process brought about the simultaneous action of pull and pressure on wet material in the presence of drying heat. This combination of physical forces on and in the material produced the beret with such comparative quickness that in the few years since the patent was issued production and sale have been large. In practice the stretching of the material over the plate was done by means of a drawstring sewed around the periphery of a circular piece of material cut to size and then pulled taut and tied before the covered plate was put into the machine which carried the heated dies and pressed them against the material on the plate. The operator could add to the tension on the moist material by manually pulling the edges as gathered by the drawstring up through a central opening in the upper die. This helped remove any wrinkles which might otherwise remain where the material had taken any pronounced folds when drawn together by the string.

The defendant relies for anticipation mainly on the patent to Kiwad, No. 1,530,001, dated March 17, 1925. The Stevens patent, No. 1,316,813, and that to Wilde & Lyon, No. 36,927, were said at first, at least, to be of some significance. However, the two last-mentioned patents are so far afield that an examination of them supports the broad statement without more that they do not anticipate Kiwad. Kiwad shows a machine for making a hat by stretching the crown and the brim while the material is moistened with steam. He uses two dies—an upper and a lower, although what is now called the upper die is no more than a narrow ring—in a machine which stretches the material while moist from steam that is permitted to escape from the lower die. He does not otherwise wet the material; nor does he use pressure with stretching except to some extent under the narrow unheated ring, already referred to as the upper die. This is brought down over a comparatively high turret in the center of the former to stretch the material in the brim and to some very slight extent, perhaps, that in the crown although clamps at the edge of the former would limit the crown-stretching action. As was suggested in our previous opinion the fact that Kiwad worked toward a hat with a crown instead of a flat-topped beret is not of vital importance. So far as that is concerned, the difference is merely one of shaping dies. We agree with the defendant that the crown-forming portion may be treated as being no more than a means for making a crown of any shape or a flat top which would serve the same purpose without being really a crown at all.

■ But Kiwad needed a high turret on his former at the top of which the edges of the material to be stretched into shape for the brim were impaled on pins. Then this material extended from the outside edge of the former to the top of the turret to form, when visualized in cross section, the hypotenuse of a right triangle of which the flat surface of the former was the base and the upright plane of the turret the other side. The comparatively thin ring, unheated, was then pushed down over the turret so that the hypotenuse of the triangle was drawn into right triangular shape and lay against the other two sides. Thus it was stretched to the extent this operation would permit and held by the ring now at the base of the turret, being drawn tightly between the pins at the top of the turret and the clamps at the edge of the former together with the added tension of the material over the edge of the former and down around the crown of the hat. There was no added pressure on the material against the former on either side except on the small surface directly under the ring and some at the jaws of the clamps at the outer edge. The material went into the machine dry and received whatever wetting took place as a result of the application of steam to it from the lower die. It is true that this steam could be shut off when desired and then the material would dry in its stretched condition. Also, the drying process would be hastened by

the heat in the lower die. There was no upper die for heating and pressing the material against the top of the former to dry it or press out any wrinkles. They were taken out by stretching alone and that portion of the material was dried as though suspended in air at room temperature plus what heat may have come up through the former from the lower die. As was pointed out in our previous opinion, supra, Kiwad did not iron the material. Except for that he did show the salient features of the patent in suit. True, the machine of Kiwad had to be changed somewhat to make a beret instead of a hat but really in ways most obvious to a skillful mechanic. Yet when so changed Kiwad would not press the material and so dry it between heated dies. When we had this case before this difference certainly appeared to be no more than what the proof on hearing might show to be only specious and that the one was in reality the equivalent of the other. Smoothing cloth, either damp or dry, with the pressure of a hot iron is too ancient a process upon which alone to rely safely for an inventive advance over the disclosure of Kiwad. But the proof now shows that this is not all there is to the Writer patent. He has combined stretching and ironing so that the turret of Kiwad is entirely eliminated as an element of the stretching means with a resultant saving of material and probably of time in manufacture. He has produced a device which works with only such stretching as is had from a drawstring and some manual pulling through a hole in the center of the upper die which is filled in Kiwad by the high turret and when put in the light most favorable to the contentions of the defendant aids this stretching to the extent necessary by ironing. What he really does, as the proof discloses, is to iron his material when damp to press and shrink out the wrinkles which have been made by the pull of the drawstring in puckering the edge of the cloth into a much smaller circle than it was before drawn over the former. So in Writer the wrinkles are deliberately put into the part of the beret which may be said to correspond to the brim of a hat, when a hat-making device like Kiwad's is to be compared to this patent, and then ironed out; while in Kiwad such stretching takes place while the brim of the hat is

being formed that, if wrinkles are formed, none remain in that part of the material which eventually forms the hat brim. So, while we can believe that Kiwad has shown a way to make a beret, his method would have to be so altered before it can be said to show what Writer accomplished that it cannot be held to anticipate the patent in suit. Kiwad aimed to stretch wrinkles out when forming hat brims. Writer succeeded in pressing them out when making berets. In Kiwad a permanent readjustment in the shape of the material was brought about by displacement under tension so severe that all ability to resume its former shape was lost. This was the sine qua non of Kiwad, and his machine was designed to produce such a pulling, while in Writer all stretching was incidental to his setting his material by pressure with heat and moisture and his design differed accordingly. To modify Kiwad to do the work of Writer would so change the purpose and design of his patent that it cannot be an anticipation. Metropolitan Device Corp. v. Williamsburg Electric Supply Co. (C. C. A.) 19 F.(2d) 442; Block v. Nathan Anklet Support Co. (C. C. A.) 9 F.(2d) 311.

A divisional application of the Kiwad patent, filed December 9, 1929, is also relied upon for anticipation. This was divided out of his original application of May 22, 1926, and canceled December 8, 1927. But little can be said in support of the claim that it does anticipate Writer even if we ignore all technical objections to considering it a part of the prior art. It revolved around the central idea which seems to have been uppermost in Kiwad's mind to steam material and stretch it so that no wrinkles would remain. This had to do with a turban hat. He uses a blocking ring "preferably made of rubber." He does not iron wrinkles out, but steams and stretches to keep them out. The pressure he mentions is pressure secured by inflating a collapsible form which presses against and stretches the material out to the die or is pressure against rubber.

In view of the result on final hearing the defendant has no cause of action on the injunction bond even though the order granting a preliminary injunction was reversed, and the order of cancellation will not be modified.

Decree affirmed.