**STOWE–WOODWARD, Inc., v. CINCINNATI RUBBER MFG. CO.**
**No. 963.**

District Court, S. D. Ohio, W. D.
Oct. 8, 1938.

Frank H. Stewart, of Boston, Mass., and Murray Seasongood, of Cincinnati, Ohio (L. G. Miller, of Boston, Mass., of counsel), for plaintiff.

Frank Zugelter, of Cincinnati, Ohio (Joseph F. Zugelter and J. Warren Kinney, Jr., both of Cincinnati, Ohio, of counsel), for defendant.

DRUFFEL, District Judge.

This is a suit for infringement of reissue letters patent No. 18,111, reissued June 29, 1931, to Stowe-Woodward Company but now owned by plaintiff. The bill seeks an injunction against defendant and prays for an accounting.

The defendant, on its part, denies infringement and challenges the validity of the patent on the following grounds: Nonconformity of law relating to reissue patents, laches relating to its disclaimer, anticipation, aggregation, lack of novelty, and invention.

The patent under consideration relates to paper machine rolls for use in top press position, said roll consisting of fragments of granite, sand, gravel, or quartz, etc., in a binder of hard rubber mounted on a metallic core.

It was the contention of plaintiff and its evidence disclosed that in the art of papermaking on the modern papermaking machine the first stage is the mixture of the stock of pulp fibre, chemicals and water at what is known as the wet end of the machine. At this point the stock comprises about 99% water. From there it flows onto a vibrating wire screen, which has the effect of draining the water and felting or putting together the tiny cellulose fibres into what is known as a wet web. The web moves along on the screen until it is picked up and deposited on a moving felt belt which also acts as a blotter to blot out more water. The *second stage* in the manufacture, and described as *the most critical,* is where the moving felt belt carrying the wet web of cellulose fibres passes through

the first set of press rolls. The web at that point comprises about 85% water and 15% fibres. As the felt belt passes between the rolls the top press roll comes in direct contact with the wet web, the function of the top press roll being to press the water from the web and to consolidate the web into a compact sheet of paper. The sheet then continues to the second press rolls to the smoothing press, drying press, etc., to the finished sheet.

Prior to the introduction of plaintiff's patented roll, which was sold under the trade name "Stonite", various types of rolls had been used in the top press position, among others, wood rolls, rubber rolls, brass rolls, gunmetal rolls, and granite rolls. All were far from satisfactory. Before the "Stonite" roll, the granite roll quarried from a solid block of granite furnished the best performance. It was more expensive than "Stonite" and frequently cracked in use, and when this occurred the roll would become a total loss. Aside from cracking, the granite roll was the subject of universal complaint in the paper trade because of what is known as "picking", that is to say, as the wet web riding on the felt belt came into contact with the granite top press roll, the fibres had a tendency to stick to the roll, thus causing "thin spots" in the paper sheet, and when the roll "picked up" too many fibres the sheet or web would be completely broken, necessitating the frequent shutdown of the machines.

With the invention and introduction of plaintiff's "Stonite" roll the difficulties experienced by paper manufacturers in the use of various type rolls in top press position were obviated. The paper manufacturing trade has generally accepted and acquiesced in the novelty and usefulness of the "Stonite" roll and it is now in use in thirty-one countries; original users are reordering, and some mills contemplate the use of "'Stonite" rolls exclusively.

A few years after plaintiff and its predecessor in title had introduced the "Stonite" roll to the paper manufacturing trade, defendant began the manufacture and sale of a top press roll, under the name of "Duratex", based on a patent issued to John F. Joseph, president of defendant company, said roll being described in the letters patent as consisting of particles of furnace slag incorporated in a binder of hard rubber and mounted on a metallic core.

After the "Duratex" roll was placed on the market plaintiff warned defendant against infringement, and defendant replied that in its opinion plaintiff's patent was void, and continued to manufacture and sell "Duratex". Plaintiff, shortly thereafter, to-wit, October 2, 1935, filed its disclaimer, limiting its patent to paper machine rolls, whereas originally it referred simply to "rolls." On December 19, 1935, plaintiff filed its bill of complaint.

Defendant's evidence tended to show that "Duratex" did function successfully in top press position in obviating pick-up and broken web, and in some instances displaced "Stonite" rolls where those rolls were defective or failed to give satisfaction; that both "Stonite" and "Duratex" rolls served the same purpose and had exactly the same characteristics except that in the "Duratex" roll slag was used in combination with hard rubber, whereas in the "Stonite" roll granite, gravel, etc., were used in combination with hard rubber.

Evidence was also tendered at great length relating to the meaning and definition of the word "rock", and of the properties and characteristics of rock and slag. It also appeared that while in the Joseph patent the following typical analysis of slag was given:

| | |
|---|---|
| Silicon dioxide | 36.8 |
| Aluminum oxide | 10.43 |
| Calcium oxide | 32.5 |
| Magnesium oxide | 14.1000 |
| Iron | 1.52 |
| Manganese | .500 |
| Sulphur | 1.00 |

slag actually used in "Duratex" resulted from the use of the following materials in the making of one ton of basic pig iron:

| | | | |
|---|---|---|---|
| Ore | 1.35 | gross | tons |
| Roll Scale | .08 | " | " |
| Open Hearth Slag | .02 | " | " |
| Scrap Iron | .27 | " | " |
| Coke | .90 | net | " |
| Stone (Limestone) | .23 | " | " |
| Gravel (essentially limestone) | .23 | " | " |

It appeared also that the primary purpose of the use of limestone and gravel or similar substances in the making of pig iron is to absorb the impurities in the iron ore, and that the resultant slag has practically all the characteristics of rock except that it may be more porous.

58

In support of its defense of anticipation, defendant offered, among others, letters patent to R. B. Adams, et al., December 1, 1925, relating to a top press roll of rubber in combination with a chemical soluble in water, preferably sugar or salt, etc.; letters patent to Charles R. Griffith, May 25, 1925, relating to improvement in top press rolls of vulcanized rubber in combination with particles of cotton, felt fibre or coarse sawdust, but no evidence was offered as to use or performance of rolls covered by said patents; letters patent to Carl A. Pfanstiehl, December 26, 1916, on new and useful improvements in processes of forming abrasive wheels, by mixing rubber gum, sulphur and granules of an abrasive material, etc.

In support of its defense of aggregation, lack of invention, lack of novelty, etc., defendant tendered letters patent relating to abrasive wheels, rubber press rolls, stone rolls, also the ordinary home laundry wringer with its two rubber press rolls.

After careful consideration of the evidence this court finds that the reissue patent in suit was sought and granted in accord with law; that the disclaimer was seasonably filed and in good faith; that analysis of the patents in evidence as to aggregation and the prior state of the art fails to show the slightest analogy or similarity as required by law, to the reissue patent in suit.

As to the separate defense of lack of invention, lack of novelty, etc., the broad specifications and claims of the Joseph patent, reinforced by evidence that the "Duratex" roll obviated the difficulties experienced by paper manufacturers prior to the introduction of the "Stonite" roll, not only disprove these defenses but actually verify the objects and claims of the reissue patent in suit.

That defendant is guilty of infringement necessarily follows when it is considered that the only difference between the two patents is the use of slag in place of granite, gravel, etc., in combination with hard rubber on a metallic core, and the evidence shows that slag is the equivalent of rock within the meaning of reissue patent No. 18,111.

Aside from the rock-slag similarity or equivalent, careful analysis of the entire record leaves no room for doubt but that defendant made and sold a top press roll similar in every respect to plaintiff's patented roll with the one exception that it used slag in place of granite, gravel, etc., and in so doing placed itself squarely within the language of the Circuit Court of Appeals for the Sixth Circuit, in Gordon Form Lathe Co. v. Walcott Machine Co., 32 F.2d 55, 61: "Tersely expressed, our opinion is that Melling accomplished the same result as Gordon, perhaps more efficiently mechanically, but nevertheless by the employment of substantially the same means, or their equivalents, operating in substantially the same manner. This has universally been held to constitute infringement, and we so hold." And, also, in Reynolds Spring Co. v. L. A. Young Industries, Inc., 6 Cir., 36 F.2d 150, 152: "We have so frequently held that mere improvement upon a patented device, without departure from the basic concept and mode of operation, does not avoid infringement, that citation of precedent seems unnecessary."

In view of the foregoing this court holds that reissue letters patent No. 18,111 is valid and has been infringed by defendant, and plaintiff is entitled to judgment in accordance with its prayer, effective as of October 2, 1935, the date of its disclaimer.