**CLUETT, PEABODY & CO., Inc., v. SAYLES FINISHING PLANTS, Inc., et al.**

No. 467.

District Court, N. D. New York.

June 22, 1943.

Pattison, Roberts & Sampson, of Troy, N. Y. (Stephen H. Philbin, of New York City, Robert Cushman, of Boston, Mass., and Clarence H. Porter, of Tipton, Iowa, of counsel), for plaintiff.

Miller, Hubbell & Evans, of Utica, N. Y. (J. L. Stackpole, of Boston, Mass., William H. Edwards, of Providence, R. I., Albert J. Monahan, of Utica, N. Y., and H. L. Kirkpatrick and Edgar H. Kent, both of Boston, Mass., of counsel), for defendants.

BRYANT, District Judge.

This is a suit for alleged breach of a license agreement for the use, by defendants, of a process employed in the pre-shrinking of cotton fabrics. The only question at issue is whether defendants' operations are within their contractual obligation to pay royalties.

The problem of shrinking, or minimizing the shrinking, of garments is old. From experience, we know the annoyance, disadvantage and expense caused by non-shrunk garments. After being laundered, a considerable portion of the garment did not exist. Quite generally the buying public purchased oversized garments to provide for shrinkage to a hoped-for size. For years this problem was studied. This is shown by the many earlier patents proposing various methods for limiting shrinkage.

Previously, the commonest method of pre-shrinking was that of water shrinking, which consisted in thoroughly wetting the cloth in a box and then drying it without tension. This process was not satisfactory. The amount of shrinking was difficult to control. The method was lengthy and expensive and affected the appearance of the goods. In or about 1917, our Navy Department called for cloth to have a residual shrinkage not exceeding two percent. The requirement had little meaning because the residual shrinkage was made by a simple soaking and drying test. This requirement greatly stimulated interest in commercial shrinkage. The parties to this action were among those who studiously sought a solution to the shrinking problem.

In 1928, defendants began shrinking on a commercial scale. They sold a pre-shrunk cotton cloth under their registered trade name, "Sayl-A-Shrunk". They guaranteed a residual shrinkage of not over .2%. Probably, if measured by the more rigorous tests now in use, the residual shrinkage would be nearer four or five percent.

In April, 1930, Cluett filed application for patent which resulted in the two Cluett patents Nos. 1,861,422 (for process) and

1,971,211 (for apparatus). The basic principle of his invention, which here, but not in the patent, he calls "compressive shrinking", is "causing the fabric to adhere to a contractable surface and then contracting the surface and the fabric with it and then setting it in that condition so it would stay there under normal handling". This is accomplished by an apparatus having a belt or blanket going in one direction around an intake roll and compressing the belt or blanket against a heated drum, the belt or blanket reversing its curvature as it goes from the intake roll on to the surface of the drum, thereby compelling the expanded surface of the belt to contract. The fabric to be shrunk is moistened, so as to render it plastic, and confined by pressure to frictional adherence to the contracting surface of the belt. Necessarily the cloth contracts with that surface. The method is clearly described by the two patents in suit.

Cluett did not long adhere to machines constructed strictly in accordance with the disclosures of the two patents. In the commercial form of the machine, for purpose of attaining greater speed, he used a drying cylinder larger than disclosed by the patents. This he found in the well known Palmer finishing machine. The Palmer machine, at that time, was widely used in finishing silks and was known as a machine for putting a face or finish on the cloth, helping to dry it, taking out the creases and giving a generally better appearance, without undue tension and stretch. The machine is so well known and widely used in the trade that description thereof is unnecessary.

In the construction of the commercial shrinking machine, Cluett specified a change in the hanging of the Palmer intake roll. The purpose of the change, as stated by Cluett, was to make the intake roll squeeze the blanket against the presser "with the proper pressure to frictionally seize the cloth and then shorten it by lengthwise contraction of the blanket surface". Cloths vary in the amount they need to be shrunk. The amount of shrinkage depends upon the point where the belt grips the cloth. For medium shrinkage the cloth is gripped by the belt or blanket at a point where some of the contraction has already taken place. If a larger percentage of shrinkage is needed the cloth, through the use of a shoe, can be gripped by the belt before any contraction in the belt takes place. The charts, exhibits 6 and 7, illustrate operations with and without the shoe.

The Cluett invention, which in 1930 commenced to be used commercially, was readily accepted by the trade and the public. This is shown by the fact that, in 1940, in addition to cloth treated by plaintiff, seventy licensees in this country used the Cluett method in treating some 861,-000,000 yards of cloth. The method was also used by twenty-seven licensees in thirteen foreign countries producing about 200,000,000 yards yearly. Cloth, when processed by the Cluett method and machines, is sold under the trade name "Sanforized". The patents have made a very important contribution to the industry and should be liberally construed. The proof fails to show any process or machine for the shrinking of cloth which limits the scope of the claims of the two Cluett patents.

In March, 1928, when defendants began using a process for the finish known as "Sayl-A-Shrunk", the cloth was shrunk by water shrinking, a net dryer being used. The cloth was smoothed by calendar rolls and batched by a steel drum. The process did not follow any of the disclosures later made by Cluett. This method is shown in defendants' Exhibit 49.

In October, 1928, one Zeller, an employee of defendants, who was not called as a witness, conducted an experiment to see if they could eliminate the calendaring of the cloth. I understand that calendering is smoothing the cloth by putting it between rolls. Zeller omitted the calendering and framing steps of rooms 2 and 4 as shown in defendants' Ex. 49. After the cloth had been run through the regular water shrinking step, it was taken to another plant and run over a Palmer head. A Palmer has a blanket around a steel drum and, as before stated, is used to finish cloth which is smoothed by being pressed between the blanket and drum. The report shows that eight strips were used in the test. It stated that "our regular product is better than the finish produced on the roll" and that "the shrinking qualities are good in pieces run over this machine". Nothing was done to follow up this test. The test was abandoned.

In 1929, defendants made three changes in their process of water shrinking. They added a blanket to the steel drum of their 1928 machine so that it would operate as a Palmer. They removed a batching roll from on top of the drum to a position in

the rear thereof. They substituted sliding bearings in place of fixed bearings for the rolls. This machine was operated by defendants in the finishing of "Sayl-A-Shrunk" cloth until 1932 when it was dismantled.

In 1930, after Cluett's application for patent was filed, defendants purchased three commercial Palmers. In 1934 they altered these machines by adding certain levers, weights and spring devices. They operated the machines secretly for several years. Finally, in 1939, after several requests, plaintiff was allowed to inspect. The machines are the ones specifically referred to in the agreements. Almost immediately after inspection, plaintiff charged infringement. Naturally the charge was denied. However, the denial must have been more or less perfunctorily made because the charge led to negotiations whereby defendants paid back royalties and agreed to pay royalties on materials treated by the inspected machines. The negotiations resulted in the making of two agreements which are the basis of this action.

One of the agreements (referred to as the printed agreement) is plaintiff's regular license agreement granting the licensee the right to purchase and use Sanforizing machines and to sell the product, if shrunk to plaintiff's established standards, under the designation "Sanforized". This agreement is not in dispute. The other agreement, Ex. B (referred to as the typewritten agreement), supplements the printed license, Ex. A. This agreement, among other things, provides for payment to plaintiff of the sum of $50,000 in settlement of patent infringement claims; for the purchase and installation of two Sanforizing machines and reimbursement of all, or part, of the purchase price by plaintiff; for the payment by defendants to plaintiff, at times and rates specified in Ex. A, of royalties on all materials treated by defendants on machines numbered D4H1M, D4H2M, D5H7M, D5H8M and D1H6M. These are the Palmers to which defendants had added levers, weights and spring devices. They are the machines operated by defendants in 1939, which plaintiff claimed infringed. The agreement states that the provisions of the printed license agreement, with certain exceptions not here important, shall be extended so as to include and apply to the aforesaid machines and the use and products therefrom. Attached to, or at least made a part of, the agreement was a chart which diagrammatically shows said machines and to which chart reference was made. Paragraph 9 of the agreement reads: "It is further agreed that it is not hereby determined whether any other, or different, machine than those specifically referred to in Exhibit A and those specifically shown and disclosed in Exhibit B, or whether any process performed thereon or any product produced thereby is or shall be considered to be within the scope of the patents under which Sayles and Sayles-Biltmore are hereby or by said license Exhibit A licensed, and any such question, if and when it arises, is left to be determined by agreement of the parties or otherwise."

■ The parties are not in accord on the interpretation of the agreements. Particularly do they differ on the construction to be placed upon paragraph 9 of the typewritten agreement. Defendants contend that paragraph 9 is ambiguous and that the true meaning thereof can only be found through a study of the correspondence preceding the contract. They claim that the negotiations leading up to the contracts created a prior agreement, binding upon the parties, which expressly exempts defendants' present machines from royalty. I do not find the paragraph ambiguous and testimony of prior negotiations is incompetent to change the same. Nevertheless, in order to have all facts before the Court, the prior correspondence was received in evidence. It does not and should not vary the natural interpretation that must be placed upon the paragraph. The contracts make the specified machines subject to payment of royalties. Whether or not any other or different machine comes under the royalty provisions is left undetermined. They do not specifically exempt any machine.

■ In 1940 and again in 1941 the defendants changed the construction of the machines specified in the license agreement. The changed machines do, in a more or less satisfactory manner, what plaintiff calls "compressive shrinking", the shrinking disclosed in the process patent. Any mechanic, with Cluett's disclosures before him, could readily change a Palmer to an equivalent of plaintiff's machine. However, defendants disclaim any change based upon patent disclosures. They contend that the machines have been changed so that they are in fact their old

1929 machines. If such be true, then defendants are exempt from the payment of royalties. If they have actually returned to their 1929 machines, then it is evident that those machines did compressive shrinking and, if used for that purpose, they show prior use and anticipation. Plaintiff admits the conclusion stated, but not the premise from which it is drawn. It contends that defendants' present machines. instead of being their 1929 machines, are the ones specified in the license agreement or their full equivalent. If such be the fact, then the royalty provisions apply. A licensee cannot avoid royalty payments by slight mechanical changes when the machine produces the same results in substantially the same · manner. Therefore, the issue narrows to whether or not defendants are actually using their earlier machines.

■■■ The burden of proving anticipation and prior use rests upon defendants. It is a heavy burden. "The proof must be as absolute as in a criminal conviction" and must come "nearly to this, that one must have contemporaneous records, verbal or structural". Block v. Anklet Support Co., Inc., 2 Cir., 9 F.2d 311-313. The proof must also show an intentional and recognized use. Showing of a piece of mechanism by which the process might have been performed is not sufficient. The mere fact that defendants owned and used some equipment, which might by proper procedure and manipulations obtain the results disclosed by the patents, does not establish prior use. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968.

Through application of sufficient pressure at the intake roll and through adjustment so that the intake roll presses against the blanket and drum with proper pressure, defendants' present machines, more or less perfectly, shrink according to the Cluett disclosures. The contemporaneous records fail to show that defendants' 1929 machines were ever so adjusted. They fail to show that such shrinking was accomplished or contemplated. In fact, they tend to prove the opposite.

The drawings of the Palmer (Ex. 52), which defendants contemplated buying, show a machine not designed to exert pressure. The only reason for nonpurchase was expense. The report of the Zeller experiment (Defts.' Ex. 55) fails to show any knowledge, recognition or use of the principle of so-called compressive or frictional shrinking.

In August, 1929, defendants applied a blanket to the steel cylinder of the machines used in one step of the Sayl-A-Shrunk process. A month or two later they substituted open brackets in place of closed fixed bearings for the bearings of the guide roll. Defendants contend that those changes caused the machines to produce the shrinkage later disclosed by the Cluett patents. This contention is not substantiated. The machine, as changed, could not do so-called frictional shrinkage unless adjusted to exert necessary and proper pressure on the cloth. There are no contemporaneous records showing such adjustment or attempted adjustment. The proof does not support the claim that defendants had any thought, hope, knowledge or anticipation that the above mentioned changes would lessen the residual shrinkage. Defendants' records of residual shrinkage, from early 1928 to 1932, do not substantiate the improvements claimed.

In 1932 defendants dismantled their 1929 machine. In 1939 they reconstructed it for the purpose of showing it to Mr. Cluett. Defts'. Ex. 37 purports to show construction of the old machine rebuilt in 1939. Their Ex. 3 purports to show construction of the 1929 machine as it was in 1940. Plaintiff's Exs. 15A–15E purport to show construction of the 1929 machine as rebuilt in 1941. The drawings show the construction different in each of these years. These drawings throw no light on the question of pressure, if any, exerted by defendants' 1929 machine. The reconstructed and reassembled machines operate in such manner and obtain such results that they must be held equivalents of defendants' machines specifically mentioned and described in the license agreement.

■■■ The evidence fails to show anticipation or prior use by defendants or any of the persons named in the answer and fails to show any prior patent disclosure.

Admittedly plaintiff is the owner of patents Nos. 1,861,422 and 1,971,211.

Plaintiff is entitled to recover royalties. ·