## ALLEN et al. v. BAY STATE IRON WORKS et al.

### No. 4361.

Circuit Court of Appeals, Third Circuit.

Oct. 17, 1930.

Hugh C. Lord, of Erie, Pa., for appellants.

David P. Wolhaupter, of Washington, D. C., and English, Quinn, Leemhuis & Tayntor, of Erie, Pa., for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and FAKE, District Judge.

WOOLLEY, Circuit Judge.

On August 11, 1925, letters Patent No. 1,549,177 issued to John F. Allen for appara-

tus designed to mold rubber articles and used chiefly in making rubber battery boxes for automobiles. The plaintiffs, assignees of the patent and the licensee, by their bill charged the defendants with infringement by the manufacture and sale of two machines of different types known in the trade as the "Vulcan Press" and the "Rub-Tex Press," respectively. After a hearing, the District Court entered a decree holding the patent valid, finding infringement by the first device and directing an injunction and accounting, and finding non-infringement by the second device. The plaintiffs bring the decree here for review only with respect to the last finding.

In order that one may understand the issue of infringement he must look into the art and into the mechanism, old and new, of the patented apparatus. For a view of the art sufficient for present purposes reference is made to the opinion of this court on the same patent in Allen et al. v. Wingerter, Receiver, 17 F.(2d) 745, where a detailed description of the apparatus may also be found. It will, with this reference, be enough to say that claim 15, typical of the other claims, provides for a rubber molding apparatus having elements of a mold, a mold carrying ram below and in movable connection with a core carrying frame above, means actuated by hydraulic pressure to force the two together, and means to melt the rubber, placed in the mold, and cause it to flow into the mold cavities and thus form the product desired—in principle all old elements—and having the new elements of "power actuating apparatus, comprising devices separating the core and lining and means associated therewith causing a power-forced separation of the mold and lining." These new elements were imposed as a condition to the grant of the patent and are the very center of the invention, without which, seemingly, there would be no invention at all.

In plain terms the invention resides in power-actuated means to extract the core from the mold and its newly formed article and withdraw the article from the mold. This is a "stripping" problem, one ever present in the art. Before the invention of the patent in suit this was a manual operation, slow and costly. By the invention of the patent the operation is semi-automatic, quickly and cheaply performed, and is effected by means described in the specification as "a hollow rod 23 secured to the mold casing and connected with the cavity 9. It extends through an opening 23a in the head 5 and is secured to a piston 24. The piston operates in a cylinder 25. Steam is admitted to the cylinder through an opening 26. Steam remains on the piston constantly so that there is a sufficient pressure to force the ram downwardly to affect the stripping of the mold lining. * * * " Associated with the mechanism holding the descending mold and the molded article is a knockout pin 14, operated on the slides 17, which hits the mold in its descent and thrusts or kicks it from the mold casing. The molded article can then be readily removed by hand. It should be observed that the movement of these various parts in the final step of stripping the article from the core and the mold are all effected by power—steam—and are all connected together. And this element of artificial force or power movement appears in different language in every claim, the substance of which is stated in the same language in several claims, namely; "to force the mold from the core" and "a power-forced separation of the mold and lining." These were precisely the things on which, in the Wingerter Case, we held the patent valid and found infringement by the Vulcan Press in conjunction with like mechanical elements in different and, in the main, in reversed positions.

The Rub-Tex Press, in its major parts, is similar to the infringing Vulcan Press and also the patented Allen press in that certain of the main features of all were taken from the prior art. We shall not stop to compare them nor shall we do more than determine whether in the Rub-Tex Press power is exerted "to force the mold from the core" and to effect a "power-forced separation of the mold and lining" substantially like or within the equivalency of the invention of the patent.

The Rub-Tex Press is made under a patent to L. W. Hottel, No. 1,652,940 for an asphalt battery box press, granted after the Wingerter decision, supra, holding the Vulcan Press an infringement. As that patent is not here in suit we make the cautionary note that nothing we shall say in comparing the Rub-Tex Press with the apparatus of the patent should be construed, even remotely, as an expression of our opinion as to the validity or scope of its claims. Our only concern with the Hottel structure is that of infringement.

The Rub-Tex Press resembles the Vulcan Press in the arrangement of ram and frame. The ram is below and the frame is above. The core is on the lower ram and the mold is suspended from an upper ram in the frame,

being a transposition of Allen. Both are brought together by hydraulic pressure and thus the article is molded. When molded, it is tightly held by core and mold, both still under great pressure. To get the article away from these tightly·compressed parts first the pressure on the core carrying lower ram is released. Even then the core, the mold and the molded article remain tightly wedged in the suspended and still compressed mold casing. To get rid of this gripping action and separate the assembled parts, pressure is next applied to the upper ram causing it to descend. As soon as it reaches a limited distance the core carrying lower ram, previously released of pressure, descends by gravity, withdrawing the core from the mold and from the molded article. On the continued descent of the upper ram the mold passes down and out of the beveled mold casing. Being thus released from lateral pressure, the plates of the mold, which are tapered, spread out. The molded article is thus released from core adhesion and lateral plate pressure and, the operation being completed, the article can be removed by hand.

It is manifest that if this description of the defendants' apparatus be correct the molded article is not "stripped" by "power-actuated apparatus," that is, the core and mold lining are not separated by "power-actuated" means for here, it is said, they are separated by gravity. Nor are the mold and lining separated by associated power means such as the knockout means of the patent for they are separated merely on the mold being released of lateral pressure. Structurally, the defendants' apparatus lacks the two elements of power-actuated means to force a separation of the core and mold and an associated power knockout means to separate the mold and mold lining, the essential features of Allen's invention. These are dispensed with and nothing substituted in their place. Even assuming these elements are there, the defendants' device also lacks coordinated power action. All these are elements of the invention on which the patent claims were granted and to which they are limited; elements, which together, as we have said before, are the very center of the invention. So it would seem that the defendants' organization, constructed as it is and functioning as it does, would not infringe the patent.

The plaintiffs conceding, as they must, the physical absence of these elements in the Rub-Tex Press maintain, however, that they are present in other means performing the same functions which fall within the range of equivalents to which the invention is entitled, and accordingly the machine infringes.

The plaintiffs find in the defendants' device the essential power movement forcibly to separate the core carried by the lower ram from the mold casing suspended from the upper ram not in any mechanism actuated by power, separately or together, but (1) in a manner of operating what we have termed old elements, and (2) in the (outside) power of gravitation. As to the first they contend that, on the release of power from the lower ram and the exertion of power upon the upper ram, the two descend together as we have described, but instead of the core being broken loose by gravity from the descending mold casing on the recession of the core carrying ram, the defendants say the core sticks fast in the mold and is only broken loose by the operator stopping the descent of the upper ram so suddenly, so abruptly or so violently that the core is jarred loose and thrust from the mold casing. They maintain that a sudden stop that jars the core loose is the "power-actuated" means for "separating the core and lining" of the patent claims.

We are loath to subscribe to the contention that a jar thus given, or a blow thus transmitted, or a thrust thus effected is the mechanical or functional equivalent of the defined power mechanism of the patent. Were it an equivalent there would be the odd situation of its being present or absent in the defendants' device according only to the different ways in which from time to time different men might operate the machine. Moreover, the impulse given the mechanism to effect the blow is personal with the operator rather than mechanical with the press. At any rate, if such a sudden stop be made and such a sudden jar or blow be given to rend asunder the adhering parts, that apparently is a new way of operating old elements— elements old even to Allen. However, there is no evidence that the machine was made by the manufacturer to be operated in that way. But there is a sharply controverted question whether this "trick" operation is actually practiced by the purchaser and user of the machine. There·is testimony that the weight of the lower ram is not sufficient to break the core loose and for this reason the operation is, and must be, practiced. It is explained by other testimony that the operators, working on piece work, sometimes hurry the operation by shutting off the power quickly and stopping the ram suddenly. On the other hand there is testimony that

such a sudden stopping and arresting of the downward movement of the upper ram is not necessary to break the core from the mold casing and molded article for when the casing is released from lateral pressure the lower ram, previously released from hydraulic pressure, will recede by gravity and the core will break loose and come out. Moreover, a sudden stopping, it is testified, is not within the principle of the operation of the machine. Neither is it desirable, for it will jar the press, break molds and thereby add to costs by increasing scrap. Therefore the operators·were under positive orders not to stop it suddenly.

After a careful study of the testimony we have not found error in the action of the learned trial court in resolving this fact issue against the plaintiffs.

And, finally, the plaintiffs, on the defendants' contention that the lower ram after being released of pressure descends by gravity and thus breaks the core from the mold, say that gravity is a "power" within the "power-actuated apparatus" and "power-forced separation" terms of the claims. While gravitation is a force of nature and in that sense a power, it, manifestly, is not the power contemplated and disclosed by the patentee. He was dealing with artificially created power such as water power and steam power. He clearly meant applied power, that is, power mechanically applied. This appears all through the claims. It was to do something more than nature would do that he invented a machine whose organization called for great pressure exerted by high power. Without such power his machine would be inoperative.

We are constrained to find the patent not infringed and affirm the decree of the District Court.